IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

BRUCE ERIC BYRD,

Defendant.

Criminal No.: ELH-11-657
Related Civil No.: ELH-21-613

**MEMORANDUM OPINION**

In this case, I consider a post-conviction petition under 28 U.S.C. § 2255 as well as a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), filed by or on behalf of defendant Bruce Eric Byrd.[1] Byrd was indicted in December 2011 (ECF 1), and a Superseding Indictment (ECF 16) was filed in February 2012. Byrd and two others were charged with conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958(a) (Count One); murder for hire under 18 U.S.C. § 1958(a) (Count Two); conspiracy to murder a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 3(A), and (k) (Count Three); murder of a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and 3(A) (Count Four); use of a firearm in relation to crimes of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Five); and conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Six).

In July 2012, Byrd entered a plea of guilty to Count Five of the Superseding Indictment, charging him with use and discharge of a firearm in relation to crimes of violence, in violation of 18 U.S.C. § 924(c). ECF 54. The plea was tendered in accordance with a Plea Agreement. ECF

---

[1] This case was originally assigned to Judge Marvin J. Garbis. It was reassigned to Judge Joseph R. Goodwin of the United States District Court for the Southern District of West Virginia on December 6, 2013, in connection with post conviction proceedings. *See* Docket. It was reassigned to me on February 9, 2021. *See id.*

57 (the "Plea Agreement").  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence of 40 years of imprisonment.  ECF 57, ¶ 8.

Of relevance here, the parties contemplated two predicate offenses for the § 924(c) conviction.  They  were conspiracy to use and cause another to use a facility in interstate commerce with intent to commit murder, resulting in the death of Isaiah Cortez Callaway, "as charged in Count One . . .", in violation of 18 U.S.C. § 1958, and "conspiracy to kill a person with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense, as set forth in Count Three . . . resulting in the death of Isaiah Cortez Callaway," in violation of 18 U.S.C. § 1512(a)(1)(C).  *Id.* ¶ 1.  Callaway was 19 years old when he was murdered.  EC 57-1 at 1 n.1.

Sentencing was held on October 15, 2012.  ECF 96.  In accordance with the Plea Agreement. Judge Garbis sentenced Byrd to 480 months of imprisonment (40 years).  *Id.*; ECF 108 (Judgment).  He is currently serving his sentence at FCI Coleman Medium.  *See* ECF 325 at 1.

Byrd has filed a pro se "Emergency Motion Requesting Home Confinement and/or a Reduction in Sentence Pursuant to the First Step Act and 18, [sic] U.S.C. § 3582(c)(1)(A)(i) and 28 U.S.C. § 1651."  ECF 322 (the "Compassionate Release Motion").  He seeks conversion of the remainder of his sentence to home confinement.  The Office of the Federal Public Defender ("FPD") has declined to supplement the Compassionate Release Motion.  ECF 329.  The government opposes the Compassionate Release Motion (ECF 340), supported by several exhibits. ECF 340-1 to ECF 340-3.  Byrd has not replied, and the time to do so has passed.

In addition, through the FPD, Byrd has filed a "Motion to Vacate Conviction Under 28 U.S.C. § 2255." ECF 326 ("§ 2255 Motion" or the "Petition").[2]  The sole argument in the § 2255 Motion is that the predicate offenses for Byrd's § 924(c) conviction (Count Five) fail to qualify as crimes of violence in light of *United States v. Davis*, ___ U.S. ___, 139 S. Ct. 2319 (2019), and subsequent cases.[3]

The government opposes the § 2255 Motion.  ECF 334; ECF 346.[4]  Its opposition is supported by one exhibit.  ECF 334-1; ECF 346-1.  And, Byrd has replied.  ECF 344.  In addition, Byrd recently submitted a letter to the Court, advising of the government's position in litigation in the Eighth Circuit, as discussed below.  ECF 347; ECF 347-1 (government's Eighth Circuit brief). The government has responded.  ECF 350.

No hearing is necessary to resolve either motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny both motions.

## I.  Background

Byrd and a codefendant, Tavon Dameon Davis, were indicted on December 6, 2011.  ECF 1.  They were charged with conspiracy to use interstate communication facilities in the commission of murder for hire, resulting in the death of Isaiah Cortez Callaway, in violation of 18 U.S.C. § 1958(a) (Count One); murder for hire, in violation of 18 U.S.C. § 1958(a) (Count Two); conspiracy

---

[2] ECF 325 is docketed as a motion to vacate.  But, it is actually Byrd's motion to the Fourth Circuit for authorization to file a successive § 2255 petition.  ECF 325 includes a proposed pro se § 2255 motion. *See id*. at 64-80.  ECF 326  is titled "Motion to Vacate Conviction Under 28 U.S.C. § 2255," and was prepared by the FPD.  But, it is docketed as a "Supplemental" to ECF 325.  I refer to ECF 325 at 64-80 and ECF 326 collectively as the "§ 2255 Motion" or the "Petition."

[3] The  § 2255 Motion is a successive § 2255 motion.  However, the Fourth Circuit authorized Byrd to file the § 2255 Motion.  ECF 324.

[4] ECF 334 was filed on the public docket, but is redacted.  ECF 346 is a sealed and unredacted version of ECF 334.  I shall generally cite to ECF 334.

to murder a witness, resulting in the death of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C),

(3)(A), and (k) (Count Three);  murder of a witness, in violation of 18 U.S.C. § 1512(a)(1)(C),

(3)(A), and (k) (Count Four); using, carrying, and discharging a firearm during and in relation to

crimes of violence, in violation of 18 U.S.C. § 924(c) (Count Five); and conspiracy to commit

bank fraud, in violation of 18 U.S.C. § 1349 (Count Six).  *See* ECF 1.

A Superseding Indictment was filed on February 23, 2012.  ECF 16.  It added a third

defendant, Frank Marfo, and charged him with each of the six counts set forth above, as well as

attempt to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Seven).  ECF 16.

Count One of the Superseding Indictment described a conspiracy between the three

defendants to commit the murder for hire of Callaway.  *Id*. at 1-7.  The three defendants were

alleged to be involved in a scheme to steal money orders and checks and to defraud banks.  *Id*.

Callaway, who also participated in the scheme, was arrested, and the three defendants became

concerned about his possible cooperation with law enforcement.  *Id*.  According to the Superseding

Indictment, the conspiracy culminated in Byrd shooting and killing Callaway on April 11, 2011,

pursuant to his agreement with and at the direction of Davis and Marfo.  *Id*. at 6-7.  Davis and

Marfo allegedly paid Byrd $2,000 to commit the murder.  *Id*. at 7.

By express terms, the charges in Count One, Count Two, Count Three, and Count Four of

the Superseding Indictment were the predicate offenses for the § 924(c) charge in Count Five of

the Superseding Indictment, and were incorporated into Count Five.  *Id*. at 11-12.

A jury trial was scheduled to begin on July 30, 2012.  *See* ECF 23.  However, on July 17,

2012, Byrd entered a plea of guilty to Count Five of the Superseding Indictment, *i.e.*, the § 924(c)

charge. ECF 54.[5]  As noted, pursuant to a Plea Agreement (ECF 57), entered under Fed. R. Crim.

P. 11(c)(1)(C), the parties agreed to a sentence of forty years of imprisonment.  *Id.* ¶ 8.

The Plea Agreement specifically provided that the predicate offenses for Count Five were conspiracy to use and cause another to use a facility in interstate commerce with intent that a murder be committed, resulting in the death of Callaway, in violation of 18 U.S.C. § 1958, and as charged in Count One of the Superseding Indictment, and conspiracy to kill a person with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission of a federal offense, resulting in the death of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C), and as set forth in Count Three of the Superseding Indictment.  ECF 57, ¶ 1.

Paragraph 2 of the Plea Agreement set forth the elements of the offenses.  The Plea Agreement specified, in part, *id.*:

> First, that the defendant committed the crimes of violence set forth in Count One and Three . . . .

> Second, that the defendant knowingly used and discharged a firearm during and in relation to these crimes of violence.

> As to the predicate violent crimes in relation to which the firearm was used and discharged, the government would have to prove beyond a reasonable doubt:

> As to the crime of violence described in Count One of the Superseding Indictment (conspiracy to use interstate communications facilities to commit murder-for-hire, 18 U.S.C. § 1958(a)) the government would prove that between on or about December 29, 2010 and April 11, 2011, in the District of Maryland, the Defendant knowingly and unlawfully conspired with at least one other person to use and cause another to use a facility in interstate commerce, to wit, various cellphones and telephones that are part of the interstate communications system, with intent that the unlawful

---

[5] Davis pled guilty to Counts One and Three of the Superseding Indictment. *See* ECF 42. Marfo proceeded to trial and was convicted of all seven counts. *See* ECF 80.

killing with malice aforethought of Isaiah Cortez Callaway be committed in violation of the laws of the United States, to wit, the offenses charged in Counts Three, Four, and Five of the Superseding Indictment, and in violation of the laws of the State of Maryland, to wit, MD Code, Criminal Law, § 2-201, first degree murder (which provides that a murder is in the first degree if it is a deliberate, premeditated, and willful killing); and MD Code, Criminal Law, § 2-204, second degree murder (which is the unlawful killing of a human being with malice aforethought); as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, that the Defendant intended that the death of Isaiah Cortez Callaway would result and that the death of Isaiah Cortez Callaway did in fact result.

As to crime [sic] of violence charged in Count Three of the Superseding Indictment (conspiracy to murder a witness, 18 U.S.C. § 1512(a)), the government would prove that between on or about December 29, 2010 and April 11, 2011, the Defendant and at least one other person knowingly and unlawfully conspired to kill Isaiah Cortez Callaway; with the intent that the killing prevent the communication to a federal law enforcement officer by Isaiah Cortez Callaway of information relating to the commission and possible commission of a federal offense, to wit, bank fraud and conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349 respectively, and that the conspiracy resulted in the first degree murder of Isaiah Cortez Callaway, in violation of 18 U.S.C. § 1111(a), in that the unlawful killing was willful, deliberate, malicious, and premeditated.

The Plea Agreement included a lengthy "Stipulated Factual Statement."  ECF 57-1.  It recounted that beginning as early as May 2009, and continuing through December 2010, Davis, Marfo, and others participated in a "fraud scheme" involving the deposit of stolen money orders into fraudulent business accounts created at various bank branches.  *Id*. at 1.  As part of this scheme, Marfo and others stole money orders from rent deposit boxes at apartment complexes in Maryland and elsewhere, substituting the payee names with the names of fraudulent business accounts opened by or at the direction of Davis.  *Id*.  Davis, Marfo, and another individual, Michael Copeland, would then withdraw the deposited proceeds.  *Id*.  In this period, Davis and Marfo caused the deposit and subsequent withdrawal at various banks of stolen, altered money orders in

6

the amount of approximately $1 million, including more than $500,000 at various Maryland branches of three banks.  *Id*.

During the course of this fraud scheme, Davis utilized his friend, Isaiah Callaway, to manage various aspects of the scheme.  *Id*.  For example, Davis directed Callaway to recruit homeless or drug addicted individuals, whom Davis referred to as "'fiends,'" to use their own identification to open fraudulent business accounts at banks into which the stolen money orders could be deposited.  *Id*.  Ultimately, "accounts were opened in the name of not less than 28 fraudulent businesses . . . ."  *Id*.  Callaway also provided various forms of identification to give the impression that the accounts were legitimate.  *Id*. at 2.

On December 29, 2010, Callaway was arrested while directing two individuals to open fraudulent business accounts at branches of TDBank and Bank of America in Baltimore County. *Id*.  These individuals identified Callaway as the person who recruited them to open the fraudulent accounts.  *Id*.  In a post-arrest statement, Callaway told police that, at the direction of another person, he had been recruiting individuals to open fraudulent business accounts at various banks into which stolen checks and money orders were deposited.  *Id*.  Callaway was charged in Baltimore County with several fraud and theft-related offenses.  *Id*.

Davis referred Callaway to an attorney who had previously represented Davis and Murfo. *Id*.  In March and April 2011, a Baltimore County Assistant State's Attorney assigned to the case provided Callaway's attorney with discovery materials, including Callaway's post-arrest statement.  A U.S. postal inspector investigating the fraud scheme contacted the attorney with a request to interview Callaway, and an Assistant U.S. Attorney ("AUSA") also contacted the attorney with the same request.  *Id*.  After the AUSA contacted the attorney, the attorney made several calls to Davis, informing him that federal investigators wanted to interview Callaway.  *Id*.

On April 11, 2011, responding to a 911 call at 1:34 a.m., Baltimore police found Callaway dead in a parked 2007 Toyota Camry in the 1700 block of Crystal Avenue in East Baltimore. *Id*. The car belonged to Callaway's girlfriend. *Id*. Callaway had four gunshot wounds on the right side of his head. *Id*. Shell casings and an autopsy revealed that he had been shot at close range with a 10mm semiautomatic handgun. *Id*. As noted, Callaway was 19 years old when he was murdered. *Id*. at 1 n.1.

The Statement of Facts recounts in great detail the evidence gathered by the government related to the offense, which I briefly summarize here. *Id*. at 2-9.[6] Callaway's girlfriend told investigators that Davis and Callaway were in frequent contact in the weeks prior to the murder, and that on the night of April 10, 2011, Callaway received a call from Davis, after which he left to see him. *Id*. at 2-3. In conversations with a government witness, Davis incriminated himself in the bank fraud scheme; expressed concern that Callaway would identify Davis to law enforcement; stated that he had paid someone $3,000 to keep Callaway from "talking," to which Marfo agreed to contribute; and mentioned that he had called Callaway on the night of the murder to direct him to the murder scene. *Id*. at 3-4.

Davis did not identify the triggerman, but described him as having been shot in the face in the past, and said that he still had a "nasty bruise." *Id*. at 4. Byrd was shot in the face in 2006, and still bears a scar. *Id*. at 4.

According to cell phone records, on the night of Callaway's murder, Davis, using two numbers, repeatedly contacted both Callaway and a cellphone subscribed to Byrd's wife. *Id*. at 5. Two witnesses testified at the grand jury that they knew this phone to have been used by Byrd at

---

[6] Although the Plea Agreement, including the Statement of Facts, is filed on the public docket, I have omitted certain details because they are redacted in ECF 334. These details are not relevant to the issues.

the time of the murder.  *Id*.  Cellular telephone records reflect numerous instances of contact between Davis and Byrd between April 5, 2011, and April 11, 2011.  *Id*. at 5-6.  In addition, cell-site records show that Byrd's phone was in the area of the murder scene around the time of the murder.  *Id*.

Davis was arrested for Callaway's murder on November 9, 2011.  *Id*. at 6.  Byrd was arrested later the same day.  *Id*. at 8.  When Byrd was told that there were witnesses who implicated him in the murder, he replied that he had been in the area of the murder that night; was supposed to meet with Davis to visit strip clubs; and knew Callaway had been killed, but did not kill him.  *Id*.

Marfo was arrested on February 13, 2012.  *Id*. at 8.  In a brief interview, after waiving his *Miranda* rights, Marfo stated, *inter alia*, that he was good friends with Davis and knew Byrd and Callaway; that he knew Callaway had been killed, but took no part in the murder; that he did not know Callaway was going to be killed; and that he did not pay any money to have him killed.  *Id*. at 9.  When asked if Davis had anything to do with the murder, he did not answer.  *Id*.

At Byrd's Rule 11 proceeding on July 17, 2012 (ECF 54), counsel for the government described in substantial detail the predicate offenses for Byrd's § 924(c) conviction, drawing from paragraph two of the Plea Agreement (ECF 57), which is quoted above.  *See* ECF 334-1 (Rule 11 Tr.) at 7-12.  After this description by the government, defendant confirmed that he understood what Judge Garbis referred to as "a thorough explanation."  *Id*. at 11.  And, when asked by Judge Garbis if there was a "need to say any more about the nature of the offense," defense counsel responded: "Nothing else is necessary."  *Id*. at 12.

As noted, sentencing was held on October 15, 2012.  ECF 96.  At the time, Byrd was 27 years old.  *See* Presentence Report ("PSR"), ECF 348 at 1.[7]  The PSR reflected a mandatory minimum term of imprisonment of ten years, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii), and noted the Rule 11(c)(1)(C) agreement for a sentence of 40 years of imprisonment.  *Id.* ¶¶ 34, 54-55, 85.

The PSR indicated that defendant had two prior criminal convictions.  *Id.* ¶¶ 38-40.  This yielded a total of three criminal history points, for a criminal history category of II.  *Id.* ¶ 41.

In particular, in 2004 Byrd was convicted in the District Court for Baltimore City of theft less than $500, and placed on one year of unsupervised probation.  *Id.* ¶ 38.  Attorney representation for that case was unknown.  *Id.*  And, in 2005, Byrd was convicted in the Circuit Court for Baltimore City of the offense of unregistered rifle/shotgun.  He was sentenced to five months and 23 days of incarceration, *id.* ¶ 39, which presumably was a time-served sentence.

Defendant is 5'7" tall and, at sentencing, he weighed 180 pounds.  *Id.* ¶ 69.  He described his childhood as a "disaster" because of the crime and the violence that he witnessed in his neighborhood.  *Id.* ¶ 63.  His parents separated when he was 14 years old, and his father, whom Byrd described as a drug user and an alcoholic, passed away from a drug overdose.  *Id.* ¶ 62.  At the time of sentencing, Byrd was separated from his wife.  *Id.* ¶ 64.  He has four children born to three different mothers.  *Id.* ¶¶ 64-65.

Byrd described his health as "ok," although he noted that, as a child, he suffered from lead poisoning.  *Id.* ¶ 69.  He reported the daily usage of marijuana from age nine until his arrest, the use of ecstasy from 2000 to 2006, and the abuse of alcohol in 2011.  *Id.* ¶¶ 71-72.

---

[7] The PSR was not docketed at the time.  However, I recently docketed the copy of the PSR that was contained in the Chambers file.  *See* ECF 349.

As noted, at sentencing, Judge Garbis sentenced Byrd to 480 months, or 40 years, of imprisonment, consistent with the Plea Agreement.  ECF 108 at 2.  In addition, Judge Garbis imposed five years of supervised release.  *Id*. at 3.

Byrd did not mount a direct appeal.  *See* Docket.  But, in 2013, he filed a motion to vacate his sentence under 28 U.S.C. § 2255.  ECF 165.  Byrd argued that he received ineffective assistance of counsel because his lawyer informed him that he would only receive a sentence of 20 to 25 years of imprisonment; that the district court imposed a sentence beyond the mandatory minimum without Byrd admitting to a necessary element; that his alleged criminal conduct did not contain a sufficient nexus with interstate commerce; and that the Superseding Indictment was defective.  *See* ECF 200 at 4-10.  In August 2014, Judge Goodwin rejected all of Byrd's arguments, and denied his motion.  ECF 200 (Memorandum Opinion and Order); ECF 201 ("Judgment Order").  Byrd appealed (ECF 202), but the Fourth Circuit denied a certificate of appealability and dismissed the appeal.  ECF 206.

The docket reflects that on April 23, 2019, the Fourth Circuit denied a motion by defendant for authorization to file a successive § 2255 motion.  ECF 314.  In addition, Byrd claimed in his motion to the Fourth Circuit for authorization to file his current § 2255 Motion that he moved for authorization to file a § 2255 motion in May 2016, citing *Johnson v. United States*, 576 U.S. 591 (2015), which the Fourth Circuit denied in June 2016.  ECF 325 at 12.  But, Byrd's § 2255 Motion, as prepared by the FPD, asserts instead that Byrd moved for authorization to file a *Johnson* § 2255 motion in December 2016, and that the Fourth Circuit denied the motion in January 2017.  ECF 326 at 3.  The Fourth Circuit docket supports the chronology offered in ECF 325.  *See In re: Bruce Byrd*, No. 16-576 (4th Cir.).

11

As noted, Byrd is currently serving his sentence at FCI Coleman Medium.  *See* ECF 325 at 1.  Federal Bureau of Prisons ("BOP") records indicate a projected release date of February 15, 2046.   ECF  340-1  at  2;  *see  also  Inmate  Locator*,  BUREAU  OF  PRISONS, https://www.bop.gov/inmateloc/ (last visited Mar. 31, 2022).  Including credit received by defendant for the period of time that he was incarcerated between November 9, 2011, and September 19, 2012 (*see* ECF 340-1 at 3), Byrd has served about 125 months of his 480-month sentence, or roughly 26%.

Byrd's BOP disciplinary record reflects a modest number of infractions, some more serious than others, and totaling four between 2013 and 2017.  *See* ECF 340-3.  In December 2017, Byrd was cited for being in an unauthorized area, and lost his email, visiting, and commissary privileges for 90 days.  *Id*. at 1.  In October 2017, he was cited for being "insolent" to a staff member, and lost his visiting and commissary privileges for 60 days.  *Id*.  In February 2016, defendant was cited for possessing alcohol, for which he was fined $50, lost 41 days of good time credit, received 30 days of disciplinary segregation, and lost his commissary privileges for 180 days.  *Id*.  Finally, in March 2013, he was cited for possessing a dangerous weapon, and lost 27 days of good time credit, received 30 days of disciplinary segregation, and lost his commissary and telephone privileges for 120 days.  *Id*. at 1-2.

BOP medical records reflect that Byrd received both doses of the Pfizer COVID-19 vaccine in April 2021.  *See* ECF 340-2.  There is no information as to whether Byrd received a booster shot.

Byrd's Compassionate Release Motion generically represents that "[h]e has a very good home to go to, with employment waiting."  ECF 322 at 15.  However, the motion provides no further detail.

## II. Compassionate Release Motion

### A.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, ___ F.4th ___, 2022 WL 905436, at *3 (4th Cir. Mar. 29, 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 2022 WL 905436, at *3.  This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 Fed. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on*

*Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

14

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 2022 WL 905436, at *3; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)). In § 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G."), titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[8]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§

---

[8] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see*

16

*also Hargrove*, 2022 WL 905436, at *3-4.  Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id*. at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 2022 WL 905436, at *6.  But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, ___ F. App'x ___, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t).  However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 2022 WL 905436, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18

U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 2022 WL 905436, at *4; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*,

___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted).

### B. COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[9]  Defendant filed his motion for compassionate release in February 2021.  ECF 322.  At the time, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant

---

[9] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension;

HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

With respect to compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 2022 WL 905436, at *4. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at *5.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020

WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[10]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[10] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[11]  Initially, the vaccines were made available to health care

---

[11] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*,

workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 66% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 72% of people from ages 18 to 64, and 89% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Apr. 11, 2022).

Moreover, roughly 98.8 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 11, 2022).  And, federal regulators have recently approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers

---

N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 11, 2022, the BOP had 135,935 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 311,063 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 11, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");   *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average

26

in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Recently, the number of COVID-19 cases began to decline considerably.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.  The country generally began to enjoy a return to normalcy.  But, the decline did not last very long.  To the contrary, we have again begun to experience an uptick in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.

As of April 11, 2022, COVID-19 has infected more than 80 million Americans and caused approximately 985,000 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS

UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 11, 2022). And, as of the same date, the BOP reported that 70 federal inmates, out of a total population of 135,395, and 146 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19. Moreover, 53,151 inmates and 12,538 staff have recovered from the virus. In addition, 292 inmates and seven staff members have died from the virus. The BOP has completed 128,781 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Coleman Medium, where the defendant is imprisoned, the BOP reported that as of April 11, 2022, out of a total of 1,533 inmates, three inmates have tested positive, five inmates and one staff member have died of COVID-19, and 344 inmates and 127 staff have recovered at the facility. In addition, 846 staff members and 5,263 inmates at the FCI Coleman complex have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/com/ (last visited Apr. 12, 2022).

### C. Discussion

### 1. Exhaustion

The government contests that Byrd has satisfied his administrative exhaustion requirements. As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow

incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

In *Muhammad*, 16 F.4th 126, the Fourth Circuit made clear that, under a plain reading of the statute, a defendant need only wait until the 30 days have passed from receipt of his compassionate release request by the warden to directly petition the court. *Id*. at 129. "The text of § 3582(c)(1)(A) plainly provides that a defendant may file a motion on his own behalf 30 days after the warden receives his request, regardless of whether the defendant exhausted his administrative remedies." *Id*. Thus, the term administrative "exhaustion," although commonly used, may to some extent be a misnomer. In any case, the statute is clear that a defendant must have, at the very least, directed a compassionate release request to the warden before filing such a request in court. *See McCoy*, 981 F.3d at 276 (noting that "defendants now may file motions for sentence modifications on their own behalf, *so long as they first apply to the BOP*.") (emphasis added).

The Fourth Circuit also clarified in *Muhammad*, 16 F.4th at 130, that this administrative requirement "is a non-jurisdictional claim-processing rule," rather than a jurisdictional provision. This means that it can be "waived if it is not timely raised." *Id*. at 129. Here, however, the government has raised it.

Byrd's Compassionate Release Motion appears to argue that the Court should waive the administrative exhaustion requirement on the grounds of futility. The motion states: "Although Defendant's administrative appeal is missing from the record, the Court can find that it has jurisdiction over his claims through waiver. . . . The BOP has already pre-judged Defendant for compassionate release and passed him by. Here, the BOP 'has already determined the issue,' to

such an extent that requiring him to submit an appeal and wait for the response would be futile." ECF 322 at 3-4 (quoting *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).[12]

The Compassionate Release Motion includes no other details or documentation as to any attempt by Byrd to satisfy the exhaustion requirements.  The government's opposition asserts that "as of June 1, 2021, [defendant's] institution of confinement reports no record of an administrative Reduction-In-Sentence ('RIS') request," although the government does not provide supporting documentation.  ECF 340 at 19.  In addition, the notice by the FPD that it would not represent Byrd states: "[T]he Federal Public Defender has not received any documents regarding Mr. Byrd's exhaustion of administrative remedies."  ECF 329.  Nor has defendant disputed the government's argument; he did not file a reply.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *Hamilton*, 715 F.3d at 337; *Edwards*, 2020 WL 1650406, at *3.  As there is no evidence that Byrd has satisfied the administrative exhaustion requirement, and indeed he seems to concede that he has not, the Compassionate Release Motion must be denied, unless there is any substance to his argument as to futility.

To my knowledge, although the Fourth Circuit has held that the administrative exhaustion requirement may be waived if not asserted by the government, it has not addressed whether the requirement is subject to equitable principles, such as tolling or futility.  *See*, *e.g.*, *Nutraceutical Corp. v. Lambert*, ___ U.S. ___, 139 S. Ct. 710, 714 (2019) ("Though subject to waiver and forfeiture, some claim-processing rules are 'mandatory'—that is, they are 'unalterable' if properly

---

[12] *Washington v. Barr* relates to the classification of marijuana under the Controlled Substances Act, not compassionate release. *See* 925 F.3d at 113. Furthermore, the case concerned non-statutory, rather than statutory, exhaustion requirements. *See United States v. Underwood*, TDC-18-0201, 2020 WL 1820092, at *3 (D. Md. Apr. 10, 2020)

raised by an opposing party. . . . Whether a rule precludes equitable tolling turns not on its jurisdictional character but rather on whether the text of the rule leaves room for such flexibility.") (internal quotation omitted); *United States v. Marsh*, 944 F.3d 524, 529-30 (4th Cir. 2019) (same).

Several other circuits have held that § 3582(c)(1)(A) imposes a mandatory claim-processing rule not subject to equitable waiver. *See, e.g.*, *United States v. Houck*, 2 F.4th 1082, 1084 (8th Cir. 2021); *United States v. Johnson*, 849 Fed. App'x 750, 753 (10th Cir. 2021); *United States v. Alam*, 960 F.3d 831, 835 (6th Cir. 2020). And, judges in this District have generally reached the same conclusion. *See United States v. Maycock*, GLR-14-0133, 2020 WL 2395620, at *2 (D. Md. May 12, 2020); *United States v. Osagbue*, PX 19-448, 2020 WL 1939713, at *1 (D. Md. Apr. 22, 2020); *United States v. Underwood*, TDC-18-0201, 2020 WL 1820092, at *2-3 (D. Md. Apr. 10, 2020); *United States v. Johnson*, 451 F. Supp. 3d 436, 440 (D. Md. 2020).

However, I am aware of one case in this District in which the Court has waived the exhaustion requirement on the ground of futility. *See United States v. Barringer*, PJM-13-0129, 2020 WL 2557035, at *2-3 (D. Md. May 19, 2020). But, that case concerned a unique circumstance not present here: the defendant was designated to one prison but had not yet been transferred and remained in the custody of the U.S. Marshal Service, meaning there was no BOP warden to whom he could submit a request. *Id*.

In sum, the weight of authority suggests that futility is not an available exception to the compassionate release statute's administrative exhaustion requirement. And, even if it were, Byrd has not offered any details or argument explaining why futility applies here, beyond a generic assertion that BOP has already "pre-judged" him. ECF 322 at 3. Accepting this argument as a basis for futility would virtually swallow the exhaustion requirement.

In view of this record, I conclude that Byrd has not satisfied the threshold requirement that he first direct a compassionate release request to the warden before seeking relief in Court.  On this ground, the Motion must fail.

### 2. Merits

Even assuming that Byrd has satisfied the administrative exhaustion requirement, his compassionate release claim fails on the merits.  This is because Byrd has failed to establish extraordinary and compelling circumstances under the compassionate release statute.

The Compassionate Release Motion is founded exclusively on the danger posed by COVID-19.  *See* generally ECF 322.[13]  But, Byrd provides no information to suggest that he has any particular health condition putting him at risk as a result of COVID-19, so as to form the basis for compassionate release.  Nor does any other information before the Court contain such a suggestion.  Indeed, Byrd is only 36 years old, indicating his age is not a risk factor, according to the CDC.  *See COVID-19 Risks and Vaccine Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Aug. 2, 2021), https://www.cdc.gov/aging/covid19/covid19-older-adults.html.  And, as noted, Byrd is vaccinated against COVID-19.  *See* ECF 340-2.

At one point, the Compassionate Release Motion states: "Defendant squarely fits the definition of an individual who has a higher risk of dying or falling severely ill from COVID-19." ECF 322 at 12.  And, elsewhere, the motion makes a passing reference to "Defendant's . . . medical history (which his [sic] medical records are in the hands of the BOP)."  *Id*. at 28.  But, the motion never provides any detail on the nature of Byrd's medical history, or any reason (beyond the fact

---

[13] The motion makes a cursory reference to Byrd's conduct while incarcerated, his plan if released, and his asserted lack of danger to others. *See* ECF 322 at 15. But, this is solely in the context of the § 3553(a) factors. And, not everything in this section of the motion seems to actually apply to Byrd. For example, the motion asserts that "[i]n [Byrd's] crime no violence occurred." *Id*. Nothing could be further from the truth.

that defendant is in prison) why he might have a greater risk of death or serious illness from COVID.

The Court acknowledges that, as discussed above, the prison environment can pose particular difficulties when it comes to addressing the COVID-19 pandemic. But, fear of COVID-19, without the presence of additional factors, does not constitute an extraordinary and compelling circumstance that warrants an inmate's release. Judge Chasanow of this Court has explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . ., generalized and unspecific reasons . . . do not satisfy the standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020). A contrary result would result in finding extraordinary and compelling circumstances for essentially the entire incarcerated population.

For the foregoing reasons, and after careful consideration, I conclude that Byrd has not established extraordinary and compelling circumstances under the compassionate relief statute.

In addition, insofar as Byrd is purely requesting home confinement, any request for the conversion of a sentence of imprisonment to a sentence of home confinement must be submitted to the BOP, and not to this Court.

Section 3624(c) of Title 18 of the United States Code is the only statute that authorizes the transfer of an inmate from prison to home confinement. That section specifically provides: "The authority under this subsection may be used to place a prisoner in home confinement for the shorter of ten percent of the term of imprisonment of that prisoner or six months." 18 U.S.C. § 3624(c)(2). However, this authority resides with the BOP, and not with the courts.

Although § 12003(b)(2) of the CARES Act states that, during the COVID-19 emergency, "the director of the Bureau [of Prisons] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement," this provision does not alter the exclusive authority of the BOP to make this determination. *See United States v. Baker*, No. l:10-cr-69-MR-1, 2020 WL 2430945, at *1 (W.D.N.C. May 12, 2020) (stating that authority to grant such relief rests solely with the Director of the Bureau of Prisons); *United States v. Gray*, No. 4:12-CR-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (finding "defendant must seek home confinement through the BOP's administrative system"); *United States v. Johnson*, Crim. No. JKB-14-0356, 2020 WL 1929459, at *2 (Apr. 21, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c).").

Therefore, this Court does not have the authority to place the defendant in home confinement. This request must be made through the BOP's administrative system.

### III. Section 2255 Motion

#### A. Standard of Review

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.' " *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Under § 2255, the Petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). And, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.' " *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill*, 368 U.S. at 428, 82 S.Ct. 468).

The scope of collateral attack under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, 578 U.S. 488, 519 (2016) (Alito, J., concurring) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). A failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion, unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains," or "actual innocence." *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

"[A]s a general matter, 'new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.'" *Welch v. United States*, 578 U.S. 120, 128 (2016). But, "[n]ew *substantive* rules generally apply

retroactively." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (emphasis in original). "This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Id*. at 351-52 (internal citations omitted). "Such rules apply retroactively because they 'necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal' or faces a punishment that the law cannot impose upon him." *Id*. at 352 (quoting *Bousley*, 523 U.S. at 620).

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief . . . " *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 Fed. App'x 557, 559 (4th Cir. 2021) (same).

No hearing is necessary. The issues involve questions of law; there are no disputed facts. Moreover, the Petition and related filings conclusively show that Byrd is not entitled to relief.

### B. Discussion

One issue is raised in the Petition: whether the predicate offenses for Byrd's conviction under 18 U.S.C. § 924(c) qualify as crimes of violence in light of *United States v. Davis*, 139 S. Ct. 2319, and subsequent cases. *See* ECF 325 at 77-80; ECF 326 at 3-6.

As noted, the predicate offenses for the § 924(c) conviction were *conspiracy* to use and cause another to use a facility in interstate commerce with intent that a murder be committed, resulting in the death of Isaiah Cortez Callaway, in violation of 18 U.S.C. § 1958; and *conspiracy*

to kill a person with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission of a federal offense, resulting in the death of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C).  ECF 57, ¶ 1.  Byrd maintains that under *Davis* these "conspiracy offenses categorically fail to qualify as 'crimes of violence.'"  ECF 326 at 1.  The government disagrees.  It argues that Byrd's predicate offenses continue to qualify as crimes of violence.  *See* ECF 334 at 13-17.

### 1. Section 924(c) Principles

Under 18 U.S.C. § 924(c)(1)(A), "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence," be sentenced to a term of imprisonment of not less than ten years, "if the firearm is discharged."

A crime of violence is defined in 18 U.S.C. § 924(c)(3) as "an offense that is a felony" and "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Subsection (A) of 18 U.S.C. § 924(c)(3) is commonly referred to as the "force clause" or "elements clause," while subsection (B) is referred to as the "residual clause."  However, the residual clause was ruled unconstitutionally vague by the Supreme Court in *Davis*, 139 S. Ct. 2319.

Under § 924(c)(3)(A), the Court focuses on the "elements" of the offense and applies the "categorical approach" to determine whether an offense is a crime of violence under the force clause.  *United States v. Runyon*, 994 F.3d 192, 200 (4th Cir. 2021)."Under the categorical approach," a court considers "only the statutory definition of the offense by its elements and the fact of conviction, without considering the actual facts supporting conviction."  *Id*.; *see United*

*States v. Bell*, 901 F.3d 455, 468-69 (4th Cir. 2018).  Indeed, the cases are legion that, under the so called "categorical approach," a court generally looks only to the elements of the underlying offense, not the facts of the case or the defendant's actual conduct, to determine whether an offense qualifies as a violent felony or a crime of violence.  *See*, *e.g.*, *Mathis v. United States*, 579 U.S. 500, 136 S. Ct. 2243, 2248-49 (2016); *Descamps v. United States*, 570 U.S. 254, 260-61 (2014); *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013); *James v. United States*, 550 U.S. 192, 202 (2007); *Taylor v. United States*, 495 U.S. 575, 602 (1990); *United States v. Winston*, 850 F.3d 677, 683-85 (4th Cir. 2017); *United States v. McNeal*, 818 F.3d 141, 152 (4th Cir. 2016) ; *see also United States v. Allred*, 942 F.3d 641, 648 (4th Cir. 2019) ("In making that determination, we counterintuitively ignore whether the defendant's actual conduct involved such a use of force."). "And when looking at the elements of the offense, [the court] must determine whether 'there is a realistic probability — not merely a theoretical possibility — that the minimum conduct *necessary* for conviction . . . involves the use of physical force as defined by federal law.'" *Runyon*, 994 F.3d at 200 (quoting *United States v. Rumley*, 952 F.3d 538, 548 (4th Cir. 2020)) (emphasis in *Runyon*); *see also Moncrieffe*, 569 U.S. at 191 ("[O]ur focus on the minimum conduct criminalized by the . . . statute is not an invitation to apply 'legal imagination' to the . . . offense."); *Allred*, 942 F.3d at 648 (similar).

"Federal law defines physical force to mean '*violent* force — that is, force capable of causing physical pain or injury to another person.'" *Runyon*, 994 F.3d at 200 (quoting *Curtis Johnson v. United States*, 559 U.S. 133, 140 (2010)) (emphasis in *Johnson*); *see also Stokeling v. United States*, ___ U.S. ___, 139 S. Ct. 544, 553 (2019) (same); *Allred*, 942 F.3d at 652 (same). "And that, of course, includes causing death to another person." *Runyon*, 994 F.3d at 200; *see United States v. Irby*, 858 F.3d 231, 236 (4th Cir. 2017).

To be sure, "not every act that causes bodily injury or death amounts to the *use* of physical force as required by § 924(c)(3)'s force clause." *Runyon*, 994 F.3d at 200 (emphasis in *Runyon*). But, "[t]he phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual." *Borden v. United States*, ___ U.S. ___, 141 S. Ct. 1817, 1825 (2021) (plurality op.).   In other words, "the knowing or intentional causation of bodily injury necessarily involves the use of physical force." *United States v. Castleman*, 572 U.S. 157, 169 (2014); *see United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019).   "That means the 'use of force' requires a higher degree of intent than reckless, negligent, or merely accidental conduct." *United States v. Roof*, 10 F.4th 314, 399 (4th Cir. 2021) (quoting *Borden*, 141 S. Ct. at 1824), *cert. petition docketed*, No. 21-7234; *see also Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). "Thus, even if the statute governing the predicate offense requires that the proscribed conduct result in death, it must also indicate a higher degree of intent than reckless, negligent, or merely accidental conduct in order to satisfy the elements clause." *Roof*, 994 F.3d at 399-400; *see also Borden*, 141 S. Ct. at 1824; *Runyon*, 994 F.3d at 200.

However, "when an offense includes alternative elements for conviction, it becomes divisible, and courts may then use a 'modified categorical approach' to determine 'which element played a part in the defendant's conviction.'" *Runyon*, 994 F.3d at 200-01 (quoting *Descamps*, 570 U.S. at 260).   "Under this approach, the court may look to the terms of the relevant charging document, jury instructions, plea agreement, plea colloquy, and the like." *Runyon*, 994 F.3d at 201; *see also Mathis*, 136 S. Ct. at 2249; *Shepard v. United States*, 544 U.S. 13, 26 (2005); *Allred*, 942 F.3d at 648.  "'[O]nce the court has [under the modified categorical approach] consulted the record and isolated the specific crime underlying the defendant's conviction, it must then apply the categorical approach to determine if it constitutes a [crime of violence],' considering only the

elements of the identified crime and the fact of conviction." *Runyon*, 994 F.3d at 201 (quoting *Allred*, 942 F.3d at 648) (alterations in *Runyon*).

## 2. *United States v. Runyon*

In *Runyon*, 994 F.3d at 201-04, a death penalty case, the Fourth Circuit considered a § 2255 petition filed by the defendant, asserting eighteen grounds for relief. *Id.* at 197, 198. The panel majority squarely held that conspiracy to commit murder for hire where death results, in violation of 18 U.S.C. § 1958(a), constitutes a crime of violence under the force clause in 18 U.S.C. § 924(c)(3). Notably, *Runyon* was decided after Byrd filed his § 2255 Motion, but before the government filed its opposition.

The defendant in *Runyon* shot and killed Cory Allen Voss as part of a murder-for-hire conspiracy. *Id.* at 197. He was convicted by a jury of conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958(a); carjacking, in violation of 18 U.S.C. § 2119; and murder with the use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). *Id.* The predicate offenses for the defendant's § 924(c) conviction were conspiracy to commit murder for hire and carjacking. *Id.* at 199. In his § 2255 petition, Runyon argued, *inter alia*, that these predicate offenses did not constitute crimes of violence, on the ground that "neither crime *necessarily* requires for conviction 'the use of physical force.'" *Id.* (emphasis in *Runyon*).

The *Runyon* Court reviewed the principles as to what constitutes a crime of violence under the force clause in 18 U.S.C. § 924(c)(3). *Id.* at 200-01. The Court acknowledged that, in general, conspiracy is not a valid predicate under the force clause. *Id.* at 199-200; *see also United States v. Simmons*, 11 F.4th 239, 253-61 (4th Cir. 2021) (concluding that generic and aggravated RICO conspiracy are not crimes of violence); *United States v. Simms*, 914 F.3d 229, 234 (4th Cir. 2019) (en banc) (holding that conspiracy to commit Hobbs Act robbery is not a crime of violence); *United*

*States v. McCollum*, 885 F.3d 300, 309 (4th Cir. 2018) (holding that conspiracy to commit murder in aid of racketeering is not categorically a crime of violence).  Nevertheless, the Court concluded that conspiracy to commit murder for hire where death results, as in Runyon's case, constituted a crime of violence.  *Runyon*, 994 F.3d at 201-04.[14]

The Fourth Circuit analyzed the text of the murder-for-hire statute, 18 U.S.C. § 1958(a). *See Runyon*, 994 F.3d at 201-02.  The statute states as follows:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

The Court said: "Because § 1958(a) imposes distinct enhanced penalties in circumstances where 'personal injury results' or where 'death results,' those are alternative elements for conviction that must be proven to the jury beyond a reasonable doubt. . . ."  *Runyon*, 994 F.3d at 202 (citations omitted).  Likewise, "the 'conspiracy' clause requires a jury to find the alternative additional element that the defendant entered into an agreement that the underlying offense be committed."  *Id.* (citations omitted).  Parsing the statutory text, the Fourth Circuit found "six distinct possible crimes" within § 1958(a), of which the sixth was "conspiracy to use facilities of commerce with the intent that a murder be committed for hire where death results."  *Id.*

---

[14] Because the jury was not asked to indicate the predicate offense on which it was relying when convicting Runyon of the § 924(c) charge, it was necessary to determine whether both predicate offenses constituted crimes of violence. *Runyon*, 994 F.3d at 201.  The Fourth Circuit reiterated that carjacking is a crime of violence, as the Court had held in *United States v. Evans*, 848 F.3d 242, 247-48 (4th Cir. 2017).

Therefore, the Court applied the modified categorical approach to determine the actual crime for which Runyon was convicted "and which was identified as a crime of violence" for his § 924(c) conviction. *Id.* Specifically, the Court looked to Runyon's indictment. *Id.* Count V of the indictment, Runyon's § 924(c) charge, accused Runyon of carrying and using a firearm "during and in relation to a crime of violence," including, *inter alia*, the crime charged in Count I of the indictment, which was the § 1958(a) charge. *Id.* And, Count I of the indictment "charged that Runyon 'did unlawfully, knowingly and intentionally conspire . . . to travel in and cause another to travel in interstate commerce . . . with intent that a murder be committed . . . as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, resulting in the death of Cory Allen Voss,' in violation of § 1958(a)." *Id.*

Moreover, "[t]he jury instructions likewise stated that finding guilt on Count I required the government to prove that Runyon engaged in a conspiracy to commit murder for hire resulting in Voss's death." *Id.* The Court concluded, *id.* at 202-03: "Thus, in finding Runyon guilty of Count I, the jury necessarily found Runyon guilty of the offense of conspiracy to use facilities of commerce with the intent that a murder be committed for hire where death results, in violation of § 1958(a)."

The Court then determined that this particular crime categorically qualified as a crime of violence. *Id.* at 203. It reasoned, *id.* (internal citations omitted) (emphasis in original):

> While conspiracy alone does not necessarily implicate the use of force, conspiracy in the context of the § 1958 offense at issue is different because it has heightened mens rea elements, as well as the element that "death results." As already noted, an act that results in death obviously requires "physical force." And the death resulting from a conspiracy to commit murder for hire has the "requisite mens rea" to constitute a *use* of physical force. The conspiracy here has two heightened mens rea elements: (1) the intent to join the conspiracy, and (2) the specific intent that a murder be committed for hire, 18 U.S.C. § 1958(a). While these mens rea elements are not explicitly tied to the resulting-in-death element, in any realistic case, they must nonetheless carry forward to the resulting-in-death element. There is no

42

"realistic probability" of the government prosecuting a defendant for entering into a conspiracy with the specific intent that a murder be committed for hire and for a death resulting from that conspiracy while that death was somehow only accidentally or negligently caused. This means that a conspiracy to commit murder for hire where death results necessarily involves the "use of physical force."

The Fourth Circuit noted that *Runyon* cited to *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), in which the Fourth Circuit remarked that "a crime may *result* in death or serious injury without involving the *use* of physical force." *Id.* at 168 (emphases in original). But, said the *Runyon* Court, "'a crime requiring the intentional causation' of injury requires the use of physical force.' And that is what we have here." *Runyon*, 994 F.3d at 203 (quoting *Battle*, 927 F.3d at 166).

Runyon also posited "a hypothetical where the target of a § 1958 murder-for-hire conspiracy died from an accidental or negligent car crash while riding in a conspirator's car and argue[d] from this that the crime can be committed without the use of violent force." *Id*. at 203. However, the Fourth Circuit remarked, *id*.: "While this hypothetical might be in the realm of 'theoretical possibility,' there is no 'realistic probability' that the government would indict the conspirator for the death-results strain of conspiracy to commit murder for hire in such a situation." (Citing *Allred*, 942 F.3d at 648). The Court said, 994 F.3d at 204 (emphases in original):

> Section 1958(a)'s mens rea elements cannot be limited to their individual clauses. If a defendant *willingly* agrees to enter into a conspiracy *with the specific intent* that a murder be committed for money and death results from that agreement, it follows that the defendant acted with *specific intent* to bring about the death of the conspiracy's victim. And this specific intent ensures that the victim's death was necessarily the result of a *use* of physical force and not merely from negligence or accident.

The government argues that *Runyon* is dispositive as to Byrd's first predicate offense, but also that its logic compels the conclusion that Byrd's second predicate offense, conspiracy to kill a witness resulting in death, is likewise a crime of violence. *See* ECF 334 at 13-17. In his reply

(ECF 344), Byrd does not disagree that, if the Court adheres to *Runyon*, his first predicate offense is a crime of violence.  *See id*. at 1, 3.  Nor does he appear to contest that, if the precedent of *Runyon* is applied, his second predicate offense is also a crime of violence.  Rather, his argument is founded on the claim that *Runyon*, and specifically the Fourth Circuit's use in *Runyon* of the "realistic probability" test, conflicts with two earlier decisions of the Fourth Circuit: *United States v. Aparicio-Soria*, 740 F.3d 152 (4th Cir. 2014) (en banc), and *Gordon v. Barr*, 965 F.3d 252 (4th Cir. 2020).  Therefore, Byrd maintains that this Court should disregard *Runyon*.  ECF 344 at 1.

As discussed, *infra*, I am bound by *Runyon*.  Moreover, *Runyon* is not an outlier.  For example, in *Battle*, 927 F.3d at 166, the Court explained that in *Castleman*, 572 U.S. at 169, the Supreme Court "teaches" that "the requisite means rea is crucial in the force analysis."  It also said, 927 F.3d at 167: "Following *Castleman*, it is impossible to intend to cause injury or death without physical force . . . ."

### 3. Applying *Runyon* to Byrd's Predicate Offenses

The government argues that *Runyon* is dispositive as to Byrd's first predicate offense.  ECF 334 at 13-14.  Indeed, as noted, Byrd does not contest that if *Runyon* applies, the issue is settled.  Because § 1958 is a divisible statute, the Court applies the modified categorical approach, and looks to relevant materials to determine the specific crime at issue.  *See Runyon*, 994 F.3d at 200-02.  And, these materials make clear that Byrd's § 1958(a) predicate was the same crime as in Runyon's case: "conspiracy to use facilities of commerce with the intent that a murder be committed for hire where death results."  *Id*. at 202.

As mentioned, Byrd's § 1958 predicate is described in the Plea Agreement as follows: "[C]onspiracy to use and cause another to use a facility in interstate commerce with intent that a murder be committed, resulting in the death of Callaway, in violation of 18 U.S.C. § 1958, and as

charged in Count One of the Superseding Indictment." ECF 57, ¶ 1.  This language does not make reference to the *for hire* aspect of murder for hire, but the whole of § 1958 concerns murder for hire, so this is of no moment.  And, the other materials make this aspect clear.  *See* ECF 16 at 1-2; ECF 57, ¶ 2.

The language refers to conspiracy, rather than simply use; conspiracy with the intent that a murder be committed; and that the conspiracy resulted in Callaway's death.  Count One of the Superseding Indictment likewise includes all of these elements.  ECF 16 at 1-2.  The elements the government would have to prove beyond a reasonable doubt as to the § 1958 predicate, as specified in the Plea Agreement, contain a similar discussion (ECF 57, ¶ 2), as did government counsel's recitation of these elements at the plea colloquy.  ECF 334-1 at 9-10.  Thus, *Runyon* makes clear that Byrd's predicate offense of conspiracy to commit murder for hire, resulting in the death of Callaway, qualifies as a crime of violence under § 924(c).

The government also argues that, applying the precedent of *Runyon*, Byrd's second predicate offense of conspiracy to kill a witness, resulting in the death of Callaway, likewise is a crime of violence.  ECF 334 at 14-17.  Again, as indicated, Byrd does not dispute that this is so if *Runyon* applies.

The federal witness tampering statute, 18 U.S.C. § 1512, forms the basis for Byrd's second predicate, and states in relevant part as follows:

(a)

    (1) Whoever kills or attempts to kill another person, with intent to—

        (A) prevent the attendance or testimony of any person in an official proceeding;

        (B) prevent the production of a record, document, or other object, in an official proceeding; or

(C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

\* \* \*

(3) The punishment for an offense under this subsection is—

(A) in the case of a killing, the punishment provided in sections 1111 [*i.e.*, murder] and 1112 [*i.e.*, manslaughter];

(B) in the case of—

(i) an attempt to murder; or

(ii) the use or attempted use of physical force against any person;

imprisonment for not more than 30 years; and

(C) in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

\* \* \*

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

Like the murder for hire statute, 18 U.S.C. § 1958, § 1512 "imposes distinct enhanced penalties in circumstances where . . . 'death results,'" *i.e.*, if the result of the offense is a killing, as provided in § 1512(a)(3)(A). *Runyon*, 994 F.3d at 202. And, like § 1958, § 1512 contains a "conspiracy clause"—§ 1512(k)—that "requires a jury to find the alternative additional element that the defendant entered into an agreement that the underlying offense be committed." *Runyon*, 994 F.3d at 202. Thus, under the same principles as in *Runyon*, § 1512 is a divisible statute for which the modified categorical approach is appropriate. Indeed, the Fourth Circuit has affirmed

that § 1512 is a "divisible" statute. *United States v. Mathis*, 932 F.3d 242, 265 n.21 (4th Cir. 2019).[15]

The relevant materials indicate that the particular crime that served as Byrd's second predicate was conspiracy to kill a witness, resulting in a killing (*i.e.*, death). The Plea Agreement describes the predicate as follows: "[C]onspiracy to kill a person with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense, resulting in the death of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C), and as set forth in Count Three of the Superseding Indictment." ECF 57, ¶ 1. This language refers to conspiracy to kill a witness, and that the conspiracy resulted in death. Count Three of the Superseding Indictment, titled "Conspiracy to Murder a Witness," contains the same elements (ECF 16 at 9), as do the discussion of elements in the Plea Agreement (ECF 57, ¶ 2) and in the plea colloquy. ECF 334-1 at 10-11.

Once the particular crime is properly identified, it is clear under the logic of *Runyon* that this crime may also qualify categorically as a crime of violence. Indeed, the relevant passages of *Runyon* are equally applicable here, but with the § 1512(a)(1)(C) offense of conspiracy to kill a witness, resulting in death, substituted for the § 1958 offense of conspiracy to commit murder for hire, resulting in death. *Runyon* said, 994 F.3d at 203-04 (emphasis in *Runyon*):

> As already noted, an act that results in death obviously requires "physical force." And the death resulting from a conspiracy to [kill a witness] has the "requisite mens rea" to constitute a *use* of physical force. The conspiracy here has two heightened mens rea elements: (1) the intent to join the conspiracy, and (2) the specific intent [to kill a witness, § 1512(a)(1)(C)]. While these mens rea elements are not explicitly tied to the resulting-in-death element, in any realistic case, they must nonetheless carry forward to the resulting-in-death element.

---

[15] *Mathis* confirmed that federal witness tampering by murder, in violation of § 1512(a)(1)(C), is a crime of violence, but did not address whether conspiracy to kill a witness, resulting in death, is a crime of violence. *See* 932 F.3d at 265.

*     *     *

Section [1512's] mens rea elements cannot be limited to their individual clauses. If a defendant *willingly* agrees to enter into a conspiracy *with the specific intent* [to kill a witness] and death results from that agreement, it follows that the defendant acted with *specific intent* to bring about the death of the conspiracy's victim. And this specific intent ensures that the victim's death was necessarily the result of a *use* of physical force and not merely from negligence or accident.

Moreover, the Fourth Circuit has made clear that "a § 924(c) conviction based on one valid and one invalid predicate offense remains sound following *Johnson* and its progeny," including "as to cases in which the defendant pleads guilty to a § 924(c) offense expressly based on the valid and invalid predicate." *United States v. Crowley*, 2 F.4th 257, 263 (4th Cir. 2021) (citing *United States v. Hare*, 820 F.3d 93, 105-106 (4th Cir. 2016)); *see also, e.g.*, *United States v. Ogun*, No. 16-7450, 2022 WL 843899, at *2 (4th Cir. Mar. 22, 2022) ("[W]e will uphold a § 924(c) conviction if it is 'expressly predicated' on at least one offense that categorically qualifies as a crime of violence or drug trafficking crime.").

Here, as the Plea Agreement indicates, Byrd's § 924(c) conviction was expressly predicated on his § 1958 offense. *See* ECF 57, ¶ 1. Thus, even if Byrd's second predicate under § 1512 does not qualify as a crime of violence, his conviction under 18 U.S.C. § 924(c) is still valid if his § 1958 predicate qualifies.

### 4. *Runyon*'s Alleged Conflict with *Aparicio-Soria* and *Gordon*

As noted, it does not appear from Byrd's reply that defendant disputes that if the Court adheres to *Runyon*, both predicate offenses qualify as crimes of violence. Rather, Byrd's argument is premised on the proposition that the Court need not follow *Runyon* because its use of the "realistic probability" test conflicts with prior Fourth Circuit opinions. *See* ECF 344. Instead, the reply argues that because conspiracy requires intent but not necessarily force, and death resulting requires force but not necessarily intent, "at most, the 'conspiracy' and 'death resulting' elements

48

each come halfway toward satisfying the force clause, but neither contains both of the clause's requirements." *Id*. at 2-3.

Specifically, Byrd cites *United States v. Aparicio-Soria*, 740 F.3d 152, and *Gordon v. Barr*, 965 F.3d 252.  I turn to review these decisions.

In *Aparicio-Soria*, the Fourth Circuit evaluated whether the Maryland crime of resisting arrest qualified categorically as a crime of violence under U.S.S.G. § 2L1.2.  That provision "advises federal district judges to increase by twelve or sixteen the offense level of a defendant convicted of unlawfully entering or remaining in the United States if that defendant has a prior felony conviction for 'a crime of violence.'" *Aparicio-Soria*, 740 F.3d at 153.  *Aparicio-Soria* concerned this so-called "reentry Guideline," but the Court looked to case law interpreting the term "violent felony" in the Armed Career Criminal Act when construing the term in the reentry Guideline. *Id.* at 154. Likewise, courts look to the Armed Career Criminal Act when interpreting "crime of violence" in § 924(c). *See Roof*, 10 F.4th at 398 n.61.

In an en banc decision, the Fourth Circuit held in *Aparicio-Soria* that the offense did not qualify as a crime of violence because the "type of de minimis force" the Maryland Court of Appeals had ruled was required for conviction under the state statute constituted a "threshold far lower than violent force capable of causing pain or injury to another," which is required to qualify as a crime of violence.  740 F.3d at 155-56 (citing *Nicolas v. State*, 426 Md. 385, 407, 44 A.3d 396, 409 (2012)).

Among other arguments, the government cited 38 opinions issued by the Maryland appellate courts that, according to the government, support the proposition that "there is no way to be convicted of resisting arrest in Maryland without the use of violent force."  *Id*. at 157.  The government urged the Court to "examine whether there is 'a realistic probability, not a theoretical

possibility, that [Maryland] would apply its statute to conduct that falls outside' the realm of violent force." *Id*. (quoting the government's brief) (alteration in *Aparicio-Soria*).  But, the Fourth Circuit said: "[T]he Government's argument misses the point of the categorical approach . . . . We do not need to hypothesize about whether there is a 'realistic probability' that Maryland prosecutors will charge defendants engaged in non-violent offensive physical contact with resisting arrest; we know that they can because the state's highest court has said so." *Id*. at 157-58.

In *Gordon v. Barr*, 965 F.3d 252, the Fourth Circuit considered whether a misdemeanor conviction under a Virginia statute prohibiting the willful discharge of a firearm in a public place without resulting bodily injury qualified as a federal "firearm offense" for purposes of removal under immigration law.  *Id*. at 254.  Applying the categorical analysis, the Court held that it did not so qualify, because the federal definition of "firearm offense" excluded antique firearms, but the Virginia statute did not.  *Id*.  The Fourth Circuit rejected the argument endorsed by the Board of Immigration Appeals in the decision under appeal, and advanced by the government on appeal, that Gordon was "required to identify a prosecution under the Virginia statute involving an antique firearm to defend against removal."  *Id*.

In conducting the categorical analysis, the Fourth Circuit looked to the language of the Virginia statute, as well as the construction given to the statute, and related statutes, by the Virginia courts.  *Id*. at 257-61.  Rejecting the government's argument that Gordon was required to present "evidence of a conviction . . . for the discharge of an antique firearm," the Court stated that the government had "fail[ed] to recognize that when the state, through plain statutory language, has defined the reach of a state statute to include conduct that the federal offense does not, the categorical analysis is complete."  *Id*. at 260-61.  And, the Court noted, *id*. at 260 n.8: "We observe

that the government relies on decisions by this Court purportedly requiring application of a 'realistic probability' test, when those holdings did *not* require the petitioner or defendant to 'find a case' in which the state applied its statute to conduct that fell outside the federal offense." (Emphasis in original.)

I am not persuaded by Byrd's argument that these two cases absolve this Court of its obligation to adhere to *Runyon*.  Notably, "lower federal courts are not free to disregard clear holdings of the circuit courts of appeal simply because a party believes them poorly reasoned or inappropriately inattentive to alternative legal arguments." *Condon v. Haley*, 21 F. Supp. 3d 572, 587 (D.S.C. 2014).

Moreover, I do not lightly assume the existence of a conflict, heretofore undiscovered, between three published and thoroughly reasoned decisions of the Fourth Circuit.  And, as I see it, the decisions are readily distinguishable.  *Runyon* is a comprehensive analysis about the precise crime at issue here—conspiracy to commit murder for hire, resulting in death.[16]  Conversely, *Aparicio-Soria* and *Gordon* involved quite different offenses: resisting arrest under Maryland law in *Aparicio-Sornia*, *see* 740 F.3d at 153, and the Virginia offense in *Gordon* of willfully discharging a firearm in a public place, without resulting injury.  *See* 965 F.3d at 254.

Central to *Aparicio-Sornia*, the Fourth Circuit deferred to the interpretation given to the Maryland statute by the Maryland Court of Appeals.  *See Aparicio-Sornia*, 740 F.3d at 158 ("We do not need to hypothesize about whether there is a 'realistic probability' that Maryland prosecutors will charge defendants engaged in non-violent offensive physical contact with resisting arrest; we know that they can *because the state's highest court has said so*.") (emphasis

---

[16] As discussed above, the second crime at issue here—conspiracy to kill a witness, resulting in death—is analogous.

added).  Likewise, the *Gordon* Court looked to "the plain language of [the Virginia statute], supported by decisions of Virginia's courts and actions of the General Assembly."  956 F.3d at 261.  The Fourth Circuit said, *id.* at 257: "When [the statutory] definition [of the offense] has been interpreted by the state's appellate courts, that interpretation is compelling in our analysis."

Moreover, *Gordon* rejected an argument that that has not been advanced here at all, and was not adopted in *Runyon*: that the petitioner had to uncover a specific case where the statute had actually been applied in the context he suggested.  *See id.* at 254, 56-57.  Indeed, the Fourth Circuit pointedly noted in *Gordon* that even its "realistic probability" cases did not require such a showing.  *Id.* at 260 n.8.  This is simply not the issue here.

Finally, I note that the "realistic probability" test was hardly invented out of whole cloth in *Runyon*, in some drastic departure from existing doctrine.  To the contrary, this test has a consistent pedigree in the Fourth Circuit, having been applied in a number of cases.  *See, e.g.*, *Rumley*, 952 F.3d at 552; *Allred*, 942 F.3d at 648; *Battle*, 927 F.3d at 164; *United States v. Drummond*, 925 F.3d 681, 689 (4th Cir. 2019); *United States v. Doctor*, 842 F.3d 306, 308-09 (4th Cir. 2016) (all employing or noting the realistic probability test).  The Fourth Circuit has likewise employed the test since *Runyon*.  *See Roof*, 10 F.4th at 398.  And, the test itself derives from the Supreme Court's admonition in *Moncrieffe*, 569 U.S. at 191, that the "focus on the minimum conduct criminalized by the state statute is not an invitation to apply 'legal imagination' to the state offense; there must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime.'"  (Internal citation omitted.)  Byrd has not mounted a sufficient argument that the Court should ignore this case law.

### 5. *Runyon*'s Alleged Conflict with *Borden*

On March 2, 2022, while the Court was working on this Memorandum Opinion, Byrd filed a submission directing the Court's attention to the government's position in a pending Eighth Circuit case, *United States v. King*, No. 18-2800 (8th Cir.). *See* ECF 347. In *King*, the issue is whether kidnapping, resulting in death, qualifies as a crime of violence. The Eighth Circuit had previously concluded that it did, noting that "intentional kidnapping necessarily involves 'a deliberate decision to endanger another' that amounts to recklessness." *Ross v. United States*, 969 F.3d 829, 839 (8th Cir. 2020), *judgment vacated sub nom. King v. United States*, ___ U.S. ___, 142 S. Ct. 332 (2021). But, in *Borden*, 141 S. Ct. at 1824, the Supreme Court clarified that recklessness is an inadequate mens rea to qualify as a violent felony under the Armed Career Criminal Act.[17]

On remand in *King*, the government conceded that kidnapping, resulting in death, is not a crime of violence. *See* ECF 347-1 (government's brief in *King*) at 6, 23-24. In the course of its analysis, the government remarked that "the categorical approach requires courts to look to the parts (the individual elements), rather than the whole (the completed crime)." *Id*. at 23. It explained that kidnapping resulting in death has four elements: the first three are those required to prove completed kidnapping, and the fourth is that death results. *Id*. at 11-12. The first three elements require intentional conduct, but they do not necessarily require force. *Id*. at 12. And, although the death results element requires force, it does not require any particular mental state. *Id*. at 12-13.

---

[17] *Borden* did not have a majority opinion, but the four-justice plurality opinion and Justice Thomas's concurrence coincide on this key holding. *See* 141 S. Ct. at 1824 (plurality), 1834 (Thomas, J., concurring).

Byrd urges the Court to follow the government's position in *King*.  ECF 347 at 1.  He argues, *id*. (emphases in original):

> [The government's position in *King*] cannot be reconciled with the government's positon [sic] in Mr. Byrd's case that conspiracy resulting in death is a § 924(c) "crime of violence." Just like kidnapping resulting in death, conspiracy resulting in death does not have any individual element which requires the intentional use of violent physical force necessary to qualify as a "crime of violence." Conspiracy (like kidnapping) does not require the use, attempted use, or *threatened use of physical force*, and resulting in death does not require the *intentional* use, attempted use, or threatened use of physical force. Yet, the government maintains that when conspiracy resulting in death is considered as a whole, it is a "crime of violence"—the exact opposite of the DOJ's argument in *King* and *Ross*.

The government has responded to Byrd's filing.  ECF 350.  It contends that the case cited by Byrd is distinguishable, and that *Runyon* is controlling authority for this Court.  *Id.*

Indeed, whatever the government's position in a case in the Eighth Circuit, involving a different predicate offense and different case law, this Court must follow the law as articulated by the Fourth Circuit.  As discussed, the government's position in this case does little more than summarize, and apply, *Runyon*, which is directly relevant.  This Memorandum Opinion has taken the same approach.  Thus, Byrd's latest submission (ECF 347) amounts to an implicit argument that *Runyon* is no longer good law in light of *Borden*.

But, "a district court is bound by the precedent set by its Circuit Court of Appeals, until such precedent is overruled by the appellate court or the United States Supreme Court."  *United States v. Brown*, 74 F. Supp. 2d 648, 652 (N.D. W. Va. 1998); *see also Doe v. Charleston Area Med. Ctr.*, 529 F.2d 638, 642 (4th Cir. 1975) ("[A] decision [of the Fourth Circuit] is binding, not only upon the district court, but also upon another panel of this court—unless and until it is reconsidered en banc."); *Fisher-Borne v. Smith*, 14 F. Supp. 3d 695, 697 (M.D.N.C. 2014) ("A decision by a circuit court is binding on this court.").  So it is here.  There is no suggestion that the

central holding of *Borden*—that recklessness is an inadequate mens rea for a crime of violence—
is implicated by this case. *See Runyon*, 994 F.3d at 204 ("If a defendant *willingly* agrees to enter
into a conspiracy *with the specific intent* that a murder be committed for money and death results
from that agreement, it follows that the defendant acted with *specific intent* to bring about the death
of the conspiracy's victim.") (emphases in original).

Moreover, since *Borden*, the Fourth Circuit has had occasion to consider *Runyon*. And, it
did not suggest that *Runyon* had been undermined. To the contrary, it affirmed both the holding
of *Runyon* and the key analytical point here—that is, that courts should look to the elements of an
offense as a whole, rather than in isolation, when determining whether the offense constitutes a
crime of violence.

In *Roof*, 10 F.4th 314, the Fourth Circuit upheld the conviction and sentence of Dylann
Storm Roof, who shot and killed nine members of the Emanuel African Methodist Episcopal
Church in Charleston, South Carolina in 2015. *Id.* at 331.[18] The comprehensive opinion spans
167 pages. Of relevance here, Roof was convicted of nine counts of the use of a firearm to commit
murder during and in relation to a crime of violence, in violation of § 924(c). *Id.* The predicate
offenses were willfully causing bodily injury because of various protected characteristics, resulting
in death, in violation of 18 U.S.C. § 249(a)(1) (the "hate crimes offenses"), and intentionally
obstructing a person in the enjoyment of that person's free exercise of religious beliefs by force or
threat of force, resulting in death, in violation of 18 U.S.C. § 247(a)(2) (the "religious obstruction
offenses"). *Id.* at 397, 400-04.

---

[18] Because all judges on the Fourth Circuit were recused, the case was heard by three judges
from other circuits, sitting by designation. *See* 10 F.4th at 329 n.1.

Roof challenged his § 924(c) convictions, arguing that these predicate offenses were not crimes of violence.  In particular, Roof argued that the hate crimes offenses were not crimes of violence because no intentional mens rea attached to the death results element, and the intentional infliction of bodily injury element did not require physical force at the level contemplated by § 924(c).  *Roof*, 10 F.4th at 401-02.  In other words, "Roof contend[ed] that, 'at most, the bodily injury and death results elements each come halfway toward satisfying the [elements] clause, though neither contains both requirements at the same time.'"  *Id*. at 402 (quoting Roof's brief) (second alteration in *Roof*).  This argument is very similar to the one made by Byrd.  *See* ECF 344 at 2-3 ("[A]t most, the 'conspiracy' and 'death resulting' elements each come halfway toward satisfying the force clause, but neither contains both of the clause's requirements.").

The Court emphatically rejected this argument.  *Roof*, 10 F.4th at 397-405.  Notably, *Roof* was decided several months after *Borden*, and the Court cited to *Borden* several times.  *See id*. at 399-400, 405 n.68.  Nevertheless, far from discarding *Runyon*, the *Roof* Court repeatedly invoked *Borden*.  *See id*. at 400, 402, 404.

Articulating principles that are also applicable here, the *Roof* Court said, *id*. at 402 (internal citations and footnotes omitted) (alterations in *Roof*):

> [W]e do not view each element of the crime in isolation. Roof's rigid division of the elements ignores the interrelated character that elements of a crime can share, and his farfetched examples of potential § 249(a)(1) violations illustrate the absurd results that arise from analyzing each element in the way that he wants. For example, he asserts that "a defendant squeezing someone's arm because of her race, causing her to lose her balance and fall to her death" constitutes a "death results" offense under § 249(a)(1).  But that hypothetical does not represent "a realistic probability" of "the minimum conduct [that] would actually be punished under the statute." And contrary to Roof's position, we often look at the elements of an offense as a whole when deciding if that offense meets the requirements of the elements clause. Doing so here, "[w]e find it difficult to imagine a realistic scenario" where a defendant could engage in conduct with the specific intent to cause bodily injury to a person, could then kill the victim, and yet do so "without

knowing or intending to inflict upon that person far more than a mere touch or scratch."

Put simply, even if Roof's emphasis on the broad definition of "bodily injury" had any merit when considered in isolation, it has none when considered in conjunction with the "death results" element.

For this analysis, *Roof* cited to both *Runyon* and *Allred*. *Id*. (quoting, *inter alia*, *Runyon*, 994 F.3d at 202-04; *Allred*, 942 F.3d at 648, 654-55). In so doing, the *Roof* Court summarized and favorably cited *Runyon*'s holding that conspiracy to commit murder for hire, resulting in death, is a crime of violence. 10 F.4th at 402 n.64. And, when Roof mounted a similar argument as to his religious obstruction offenses, the Court rejected it, again citing both *Runyon* and *Allred*. *Id*. at 404-05.

In sum, all of Byrd's § 2255 arguments rest on the notion that, for one reason or another, *Runyon* is no longer good law. But unless and until the Fourth Circuit says otherwise, I am bound by *Runyon*, which clearly applies here. I shall deny the § 2255 Motion.

### C. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the

constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

Although I reject Byrd's claim, I recognize the gravity and complexity of the issues. Therefore, I shall issue a COA.

## IV.  Conclusion

For the reasons set forth above, I shall deny the Compassionate Release Motion, and the § 2255 Motion.  However, I shall issue a Certificate of Appealability.

An Order follows, consistent with this Memorandum Opinion.

Date: April 13, 2022                                          _____/s/_____

                                                                     Ellen L. Hollander
                                                                     United States District Judge