IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

BRUCE BYRD,

*Defendant*.

CRIMINAL No. ELH-11-657

**MEMORANDUM OPINION**

In this Memorandum Opinion, I consider the motion for compassionate release filed by the self-represented defendant, Bruce Eric Byrd, under 18 U.S.C. § 3582(c)(1)(A)(i).  *See* ECF 358, ECF 358-1.[1]

Byrd and a codefendant were indicted in December 2011.  ECF 1.  In a Superseding Indictment (ECF 16) filed in February 2012, Byrd and two others were charged with conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958(a) (Count One); murder for hire under 18 U.S.C. § 1958(a) (Count Two); conspiracy to murder a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 3(A), and (k) (Count Three); murder of a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and 3(A) (Count Four); use of a firearm in relation to crimes of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Five); and conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Six).  By express terms, the charges in Count One, Count Two, Count Three, and Count Four of the Superseding Indictment were the predicate offenses for the § 924(c) offense charged in Count Five of the Superseding Indictment, and were incorporated

---

[1]  This case was originally assigned to Judge Marvin J. Garbis, who has since retired. It was reassigned to Judge Joseph R. Goodwin of the United States District Court for the Southern District of West Virginia on December 6, 2013, in connection with post conviction proceedings, because of a conflict of interest. *See* Docket.  It was reassigned to me on February 9, 2021.  *See id.*

into Count Five. *Id.* at 11–12. The murder victim, Isaiah Cortez Callaway, was 19 years old. ECF 57-1 at 1 n.1.

In July 2012, Byrd entered a plea of guilty to Count Five of the Superseding Indictment, charging him with use and discharge of a firearm in relation to crimes of violence, in violation of 18 U.S.C. § 924(c). ECF 54. The plea was tendered pursuant to a Plea Agreement. ECF 57 (the "Plea Agreement"). And, in accordance with Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence of 40 years of imprisonment. *Id.* 57, ¶ 8.

In the Plea Agreement, the § 924(c) offense (Count Five) was predicated on two offenses: conspiracy to use and cause another to use a facility in interstate commerce with intent to commit murder, resulting in the death of Isaiah Cortez Callaway, "as charged in Count One . . .", in violation of 18 U.S.C. § 1958, and "conspiracy to kill a person with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense, as set forth in Count Three . . . resulting in the death of Isaiah Cortez Callaway," in violation of 18 U.S.C. § 1512(a)(1)(C). *Id.* ¶ 1.

Sentencing was held on October 15, 2012. ECF 96. In accordance with the Plea Agreement, Judge Garbis sentenced Byrd to 40 years of imprisonment (480 months). *Id.*; ECF 108 (Judgment). Defendant is currently serving his sentence at FCI Jesup in Georgia. *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Aug. 28, 2025). Byrd did not appeal. *See* Docket.

On February 9, 2021, Byrd, pro se, filed an "Emergency Motion Requesting Home Confinement and/or a Reduction in Sentence Pursuant to the First Step Act and 18, [sic] U.S.C. § 3582(c)(1)(A)(i) and 28 U.S.C. § 1651." ECF 322. In addition, on March 9, 2021, through the

Office of the Federal Public Defender ("FPD"), Byrd filed a "Motion to Vacate Conviction Under 28 U.S.C. § 2255." ECF 326. These motions are not at issue here, but are discussed, *infra*.

At issue here is Byrd's pro se "Motion for Sentence Reduction Pursuant to 18, U.S.C. § 3582(c)(1)(A)(i)." ECF 358 (the "Motion"). The Motion is supported by an exhibit. ECF 358-1. Defendant contends that there is "a significant and unwarranted disparity" between the sentence he received in 2012 "and what he would receive today for the same conduct." ECF 358 at 5. He also claims that he has been a "model inmate" and does not "pose a risk to society." *Id.* The FPD has declined to supplement the Motion. ECF 360. The government opposes the Motion. ECF 363. Byrd did not reply. *See* Docket.

No hearing is necessary to resolve the motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I. Factual Background[2]

Byrd and a codefendant, Tavon Dameon Davis, were indicted on December 6, 2011. ECF 1. They were charged with conspiracy to use interstate communication facilities in the commission of murder for hire, resulting in the death of Isaiah Cortez Callaway, in violation of 18 U.S.C. § 1958(a) (Count One); murder for hire, in violation of 18 U.S.C. § 1958(a) (Count Two); conspiracy to murder a witness, resulting in the death of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C), (3)(A), and (k) (Count Three); murder of a witness, in violation of 18 U.S.C. § 1512(a)(1)(C), (3)(A), and (k) (Count Four); using, carrying, and discharging a firearm during and in relation to crimes of violence, in violation of 18 U.S.C. § 924(c) (Count Five); and conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Six). *See* ECF 1.

---

[2] I restate here, to the extent relevant, the factual background set forth in my Memorandum Opinion of April 13, 2022, denying a post-conviction motion and a motion for compassionate release. *See* ECF 351.

A Superseding Indictment was filed on February 23, 2012.  ECF 16.  It added a third defendant, Frank Marfo, and charged him with each of the six counts set forth above, as well as attempt to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Seven).  ECF 16.

Count One of the Superseding Indictment described a conspiracy between the three defendants to commit the murder for hire of Callaway.  *Id*. at 1–7.  The three defendants were alleged to be involved in a scheme to steal money orders and checks and to defraud banks.  *Id*. Callaway, who also participated in the scheme, was arrested, and the three defendants were concerned about his possible cooperation with law enforcement.  *Id*.  According to the Superseding Indictment, the conspiracy culminated in Byrd shooting and killing Callaway on April 11, 2011, pursuant to his agreement with and at the direction of Davis and Marfo.  *Id*. at 6–7.  Davis and Marfo allegedly paid Byrd $2,000 to commit the murder.  *Id*. at 7.

A jury trial was scheduled to begin on July 30, 2012.  *See* ECF 23.  However, on July 17, 2012, Byrd entered a plea of guilty to Count Five of the Superseding Indictment, *i.e.*, the § 924(c) charge.  ECF 54.[3]  As noted, pursuant to a Plea Agreement (ECF 57), entered under Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence of 40 years of imprisonment.  *Id*. ¶ 8.

As noted, the Plea Agreement specifically identified two predicate offenses for Count Five. They were conspiracy to use and cause another to use a facility in interstate commerce with intent that a murder be committed, resulting in the death of Callaway, in violation of 18 U.S.C. § 1958, and as charged in Count One of the Superseding Indictment, and conspiracy to kill a person with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission of a federal offense, resulting in the death

---

[3]  Davis pleaded guilty to Counts One and Three of the Superseding Indictment.  *See* ECF 42.  Marfo proceeded to trial and was convicted of all seven counts.  *See* ECF 80.

of Callaway, in violation of 18 U.S.C. § 1512(a)(1)(C), and as set forth in Count Three of the

Superseding Indictment.  ECF 57, ¶ 1.

Paragraph 2 of the Plea Agreement (ECF 57) set forth the elements of the offenses. The

Plea Agreement specified, in part, *id*.:

> First, that the defendant committed the crimes of violence set forth in Count
> One and Three . . . .

> Second, that the defendant knowingly used and discharged a firearm during
> and in relation to these crimes of violence.

> As to the predicate violent crimes in relation to which the firearm was used
> and discharged, the government would have to prove beyond a reasonable doubt:

> As to the crime of violence described in Count One of the Superseding
> Indictment (conspiracy to use interstate communications facilities to commit
> murder-for-hire, 18 U.S.C. § 1958(a)) the government would prove that between
> on or about December 29, 2010 and April 11, 2011, in the District of Maryland, the
> Defendant knowingly and unlawfully conspired with at least one other person to
> use and cause another to use a facility in interstate commerce, to wit, various
> cellphones and telephones that are part of the interstate communications system,
> with intent that the unlawful killing with malice aforethought of Isaiah Cortez
> Callaway be committed in violation of the laws of the United States, to wit, the
> offenses charged in Counts Three, Four, and Five of the Superseding Indictment,
> and in violation of the laws of the State of Maryland, to wit, MD Code, Criminal
> Law, § 2-201, first degree murder (which provides that a murder is in the first
> degree if it is a deliberate, premeditated, and willful killing); and MD Code,
> Criminal Law, § 2-204, second degree murder (which is the unlawful killing of a
> human being with malice aforethought); as consideration for the receipt of, and as
> consideration for a promise and agreement to pay, something of pecuniary value,
> that the Defendant intended that the death of Isaiah Cortez Callaway would result
> and that the death of Isaiah Cortez Callaway did in fact result.

> As to [the] crime of violence charged in Count Three of the Superseding
> Indictment (conspiracy to murder a witness, 18 U.S.C. § 1512(a)), the government
> would prove that between on or about December 29, 2010 and April 11, 2011, the
> Defendant and at least one other person knowingly and unlawfully conspired to kill
> Isaiah Cortez Callaway; with the intent that the killing prevent the communication
> to a federal law enforcement officer by Isaiah Cortez Callaway of information
> relating to the commission and possible commission of a federal offense, to wit,
> bank fraud and conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344
> and 1349 respectively, and that the conspiracy resulted in the first degree murder
> of Isaiah Cortez Callaway, in violation of 18 U.S.C. § 1111(a), in that the unlawful
> killing was willful, deliberate, malicious, and premeditated.

The Plea Agreement included a lengthy "Stipulated Factual Statement." ECF 57-1. It recounted that beginning as early as May 2009, and continuing through December 2010, Davis, Marfo, and others participated in a "fraud scheme" involving the deposit of stolen money orders into fraudulent business accounts created at various bank branches. *Id*. at 1. As part of this scheme, Marfo and others stole money orders from rent deposit boxes at apartment complexes in Maryland and elsewhere, substituting the payee names with the names of fraudulent business accounts opened by or at the direction of Davis. *Id*. Davis, Marfo, and another individual, Michael Copeland, would then withdraw the deposited proceeds. *Id*. In this period, Davis and Marfo caused the deposit and subsequent withdrawal at various banks of stolen, altered money orders in the amount of approximately $1 million, including more than $500,000 at various Maryland branches of three banks. *Id*.

During the course of this fraud scheme, Davis utilized his friend, Callaway, to manage various aspects of the scheme. *Id*. For example, Davis directed Callaway to recruit homeless or drug addicted individuals, whom Davis referred to as "'fiends,'" to use their own identification to open fraudulent business accounts at banks into which the stolen money orders could be deposited. *Id*. Ultimately, "accounts were opened in the name of not less than 28 fraudulent businesses . . . ." *Id*. Callaway also provided various forms of identification to give the impression that the accounts were legitimate. *Id*. at 2.

On December 29, 2010, Callaway was arrested while directing two individuals to open fraudulent business accounts at branches of TDBank and Bank of America in Baltimore County. *Id*. These individuals identified Callaway as the person who recruited them to open the fraudulent accounts. *Id*. In a post-arrest statement, Callaway told police that, at the direction of another person, he had been recruiting individuals to open fraudulent business accounts at various banks

6

into which stolen checks and money orders were deposited. *Id*. Callaway was charged in Baltimore County with several fraud and theft-related offenses. *Id*.

Davis referred Callaway to an attorney who had previously represented Davis and Murfo. *Id*. In March and April 2011, the State prosecutor provided Callaway's attorney with discovery materials, including Callaway's post-arrest statement. A U.S. postal inspector investigating the fraud scheme contacted the attorney with a request to interview Callaway, and an Assistant U.S. Attorney ("AUSA") also contacted the attorney with the same request. *Id*. After the AUSA contacted the attorney, the attorney made several calls to Davis, informing him that federal investigators wanted to interview Callaway. *Id*.

On April 11, 2011, responding to a 911 call at 1:34 a.m., Baltimore police found Callaway dead in a parked 2007 Toyota Camry in the 1700 block of Crystal Avenue in East Baltimore. *Id*. The car belonged to Callaway's girlfriend. *Id*. Callaway had four gunshot wounds on the right side of his head. *Id*. Shell casings and an autopsy revealed that he had been shot at close range with a 10mm semiautomatic handgun. *Id*. As noted, Callaway was 19 years old when he was murdered. *Id*. at 1 n.1.

The Statement of Facts recounts in great detail the evidence gathered by the government related to the offense, which I briefly summarize here. *Id*. at 2–9.[4] Callaway's girlfriend told investigators that Davis and Callaway were in frequent contact in the weeks prior to the murder, and that on the night of April 10, 2011, Callaway received a call from Davis, after which Callaway left to meet Davis. *Id*. at 2–3. In conversations with a government witness, Davis incriminated himself in the bank fraud scheme; expressed concern that Callaway would identify Davis to law

---

[4] Although the Plea Agreement, including the Statement of Facts, is filed on the public docket, I have omitted certain details because they are redacted in ECF 334. These details are not relevant to the issues.

enforcement; stated that he had paid someone $3,000 to keep Callaway from "talking," and Marfo agreed to contribute; and mentioned that he had called Callaway on the night of the murder to direct him to the murder scene. *Id*. at 3–4.

Davis did not identify the triggerman, but described him as having been shot in the face in the past, and said that he still had a "nasty bruise." *Id*. at 4. Byrd was shot in the face in 2006, and still bears a scar. *Id*.

According to cell phone records, on the night of Callaway's murder, Davis, using two numbers, repeatedly contacted both Callaway and a cellphone for which Byrd's wife was the subscriber. *Id*. at 5. Two witnesses testified at the grand jury that they knew this phone to have been used by Byrd at the time of the murder. *Id*. Cellular telephone records reflect numerous instances of contact between Davis and Byrd between April 5, 2011, and April 11, 2011. *Id*. at 5–6. In addition, cell-site records show that Byrd's phone was in the area of the murder scene around the time of the murder. *Id*.

Davis was arrested for Callaway's murder on November 9, 2011. *Id*. at 6. Byrd was arrested later that day. *Id*. at 8. When Byrd was told that there were witnesses who implicated him in the murder, he replied that he had been in the area of the murder that night; was supposed to meet with Davis to visit strip clubs; and knew Callaway had been killed. *Id.* But, he denied that he killed Callaway. *Id*.

Marfo was arrested on February 13, 2012. *Id*. at 8. After waiving his *Miranda* rights, Marfo stated, *inter alia*, that he was good friends with Davis and knew Byrd and Callaway; that he knew Callaway had been killed, but took no part in the murder; that he did not know Callaway was going to be killed; and that he did not pay any money to have him killed. *Id*. at 9. When asked if Davis had anything to do with the murder, he did not answer. *Id*.

At Byrd's Rule 11 hearing on July 17, 2012 (ECF 54), counsel for the government described in substantial detail the predicate offenses for Byrd's § 924(c) conviction, drawing from paragraph two of the Plea Agreement (ECF 57), which is quoted above. *See* ECF 334-1 (Rule 11 Tr.) at 7–12. After this description by the government, defendant confirmed that he understood what Judge Garbis referred to as "a thorough explanation." *Id.* at 11. And, when asked by Judge Garbis if there was a "need to say any more about the nature of the offense," defense counsel responded: "Nothing else is necessary." *Id.* at 12.

As noted, sentencing was held on October 15, 2012. ECF 96. The Presentence Report reflected a mandatory minimum term of imprisonment of ten years, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii), and noted the Rule 11(c)(1)(C) agreement for a sentence of 40 years of imprisonment. *See* Presentence Report ("PSR", ECF 348), ¶¶ 34, 54–55, 85.[5]

The PSR indicated that defendant had two prior criminal convictions. *Id.* ¶¶ 38–40. This yielded a total of three criminal history points, with a criminal history category of II. *Id.* ¶ 41. In particular, in 2004 Byrd was convicted in the District Court for Baltimore City of theft less than $500, and placed on one year of unsupervised probation. *Id.* ¶ 38. Attorney representation for that case was unknown. *Id.* And, in 2005, Byrd was convicted in the Circuit Court for Baltimore City of the offense of unregistered rifle/shotgun. He was sentenced to five months and 23 days of incarceration, *id.* ¶ 39, which presumably was a time-served sentence.

At the time of sentencing, Byrd was 27 years of age. ECF 348 at 1. He is 5'7" tall and, at sentencing, he weighed 180 pounds. *Id.* ¶ 69. He described his childhood as a "disaster" because of the crime and the violence that he witnessed in his neighborhood. *Id.* ¶ 63. His parents separated

---

[5] The PSR was not docketed at the time. However, in 2022, while working on Byrd's earlier motions, I docketed the copy of the PSR that I located in the Chambers file. *See* ECF 349.

when he was fourteen years old, and his father, whom Byrd described as a drug user and an alcoholic, passed away from a drug overdose. *Id*. ¶ 62. At the time of sentencing, Byrd was separated from his wife. *Id*. ¶ 64. He is the father of four children, born to three mothers. *Id*. ¶¶ 64–65.

Byrd described his health as "ok." *Id*. ¶ 69. But, he noted that, as a child, he suffered from lead poisoning. *Id*. He reported the daily usage of marijuana from age nine until his arrest, the use of ecstasy from 2000 to 2006, and the abuse of alcohol in 2011. *Id*. ¶¶ 71–72.

Consistent with the Plea Agreement, Judge Garbis sentenced Byrd to 480 months (40 years) of imprisonment. ECF 108 at 2. In addition, Judge Garbis imposed five years of supervised release. *Id*. at 3.[6]

Byrd did not lodge an appeal. *See* Docket. But, in 2013, he filed a motion to vacate his sentence under 28 U.S.C. § 2255. ECF 165. Byrd argued that he received ineffective assistance of counsel because his lawyer informed him that he would only receive a sentence of 20 to 25 years of imprisonment; the district court imposed a sentence beyond the mandatory minimum without Byrd admitting to a necessary element; his criminal conduct did not contain a sufficient nexus with interstate commerce; and the Superseding Indictment was defective. *See* ECF 200 at 4–10. In August 2014, Judge Goodwin rejected Byrd's contentions and denied his § 2255 motion. ECF 200 (Memorandum Opinion and Order); ECF 201 ("Judgment Order"). Byrd appealed (ECF 202), but the Fourth Circuit denied a certificate of appealability and dismissed the appeal. ECF 206.

---

[6] Davis received a sentence of 420 months. ECF 43 at 8. Marfo received four concurrent life sentences. ECF 117 at 3.

Then, in May 2016, defendant moved for authorization in the Fourth Circuit to file a § 2255 motion, citing *Johnson v. United States*, 576 U.S. 591 (2015). *See* ECF 325 at 12. The Fourth Circuit denied the request in June 2016. *See In re: Bruce Byrd*, No. 16-576 (4th Cir.). On April 23, 2019, the Fourth Circuit again denied a motion by defendant for authorization to file a successive § 2255 motion. ECF 314.

As noted earlier, on February 9, 2021, Byrd, pro se, filed an "Emergency Motion Requesting Home Confinement and/or a Reduction in Sentence Pursuant to the First Step Act and 18, [sic] U.S.C. § 3582(c)(1)(A)(i) and 28 U.S.C. § 1651." ECF 322 ("First Compassionate Release Motion"). He sought the conversion of the remainder of his sentence to home confinement. I construed ECF 322 as a compassionate release motion. *See* ECF 351.

Then, on March 9, 2021, through the FPD, Byrd filed a "Motion to Vacate Conviction Under 28 U.S.C. § 2255." ECF 326 ("§ 2255 Motion"). Although the § 2255 Motion was a successive one, the Fourth Circuit authorized it. ECF 324. Byrd's sole argument in the § 2255 Motion was that the predicate offenses (Count One and Count Three) for Byrd's § 924(c) conviction (Count Five) failed to qualify as crimes of violence in light of *United States v. Davis*, 558 U.S. 445 (2019), and subsequent cases.

By Memorandum Opinion and Order of April 14, 2022 (ECF 351, ECF 352), I denied both the § 2255 Motion and Byrd's First Compassionate Release Motion. Byrd did not appeal. *See* Docket.

Byrd is currently serving his sentence at FCI Jesup. *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Aug. 28, 2025). He has a projected release date of February 15, 2046. *Id.* Including credit for pretrial detention (November 9, 2011

to September 19, 2012, ECF 340-1 at 3), Byrd has served about 165 months of his 480-month sentence, or roughly 34%.

Byrd's disciplinary records at the Bureau of Prisons ("BOP") reflect four infractions, some more serious than others. All four occurred between 2013 and 2017. *See* ECF 340-3; ECF 358-1; ECF 363 at 11. The Court has not been apprised of any additional infractions.

In December 2017, Byrd was cited for being in an unauthorized area, and lost his email, visiting, and commissary privileges for 90 days. *Id*. at 1. In October 2017, he was cited for being "insolent" to a staff member, and lost his visiting and commissary privileges for 60 days. *Id*. In February 2016, defendant was cited for possessing alcohol, for which he was fined $50, lost 41 days of good time credit, received 30 days of disciplinary segregation, and lost his commissary privileges for 180 days. *Id*. And, in March 2013, he was cited for possessing a dangerous weapon, and lost 27 days of good time credit, received 30 days of disciplinary segregation, and lost his commissary and telephone privileges for 120 days. *Id*. at 1–2.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Moody*, 115 F.4th 304, 310 (4th Cir. 2024); *United States v. Davis*, 99 F.4th 647, 653 (4th Cir. 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).

But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

A statutory exception is codified at 18 U.S.C. § 3582, which was first enacted as part of the Sentencing Reform Act of 1984. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). It is commonly termed the "'compassionate release exception.'" *Moody*, 115 F.4th at 310; *see United States v. Osman*, 2024 WL 3633573, at *3 (4th Cir. Aug. 2, 2024) (per curiam) (unreported) (stating that a motion under § 3582(c)(1)(A) is "commonly referred to as a motion for compassionate release. . . ."). Specifically, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court, in its discretion, to reduce a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction,"; "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and the court has considered the factors under 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Crawley*, 140 F.4th 165, 169 (4th Cir. 2025); *Hargrove*, 30 F.4th at 194.

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion made by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP). However, the safety valve of § 3582 languished, because the BOP rarely filed such a motion on an inmate's behalf. As a result, compassionate release was an infrequent occurrence. *See Hr'g on Compassionate Release and the Conditions of Supervision*

*Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In 2018, with the passage of the First Step Act, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582. *Malone*, 57 F.4th at 173. In particular, the FSA authorized a court to grant compassionate release "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added); *see also Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). In other words, a federal inmate is now able to file a motion for compassionate release directly with the court, as long as the inmate first exhausts administrative remedies. *See McCoy*, 981 F.3d at 275–76. If a defendant has already exhausted administrative remedies upon filing a first motion for compassionate release, the defendant does not need to meet the bar for exhaustion a second time, should the defendant seek to renew the motion. *United States v. King*, 2025 WL 1692747, at *1 (4th Cir. June 17, 2025) (unreported).

However, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are satisfied. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831.[7] Specifically,

---

[7] The Fourth Circuit has said that there are two criteria, and that the first criterion consists of two steps. *See*, *e.g.*, *Malone*, 57 F.4th at 173. More recently, however, in *Crawley*, 140 F.4th at 169, the Fourth Circuit stated that there are three criteria. Whether the criteria are counted as two or three, the substance is the same.

"the district court must conduct a two-step analysis." *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024); *see also Bond*, 56 F.4th at 383.

The first step consists of two parts. The court "must determine: (1) whether extraordinary and compelling reasons warrant. . .a [sentence] reduction; and (2) that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Malone*, 57 F.4th at 173; *see Moody*, 115 F.4th at 310; *Davis*, 99 F.4th at 653; *Bond*, 56 F.4th at 383; *Bethea*, 54 F.4th at 831; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 383 (2021). The court's analysis of these two steps goes hand in hand. *United States v. Burleigh*, 145 F.4th 541, 547 (4th Cir. 2025). If that first step is met, the court then proceeds to the second step.

Under the second step, the court must determine whether release is appropriate in light of the sentencing factors in 18 U.S.C. § 3553(a), "to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see Moody*, 115 F.4th at 310; *Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647; *Kibble*, 992 F.3d at 330. "Importantly, a court assessing a compassionate release motion is entitled to consider the § 3553(a) factors '[o]nly after' conducting the first step's analysis." *Osman*, 2024 WL 3633573, at *4 (citations omitted) (alteration in *Osman*); *see Malone*, 57 F.4th at 173 (stating that the district court may consider the § 3553(a) sentencing factors only after determining that extraordinary and compelling reasons warrant a sentence reduction and that a reduction is consistent with the Sentencing Commission's policy statements).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647. Notably, "it weighs against an abuse of discretion—and is viewed

as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see United States v. Gutierrez*, 2023 WL 245001, at *5 (4th Cir. Jan. 18, 2023) (unreported); *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.

As the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99 F.4th at 653–54. However, if there is no applicable policy statement relating to the defendant's compassionate release motion, the court has discretion to make its "own independent determination of what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A)." *Burleigh*, 145 F.4th 541, 548 (cleaned up); *see also United States v. Johnson*, 143 F.4th 212, 215 (4th Cir. 2025) (explaining that, "[i]n the absence of an applicable policy statement, district courts" have the power to "consider *any* extraordinary and compelling reason for release") (cleaned up).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). "[U]ntil recently," that Policy Statement did not apply to motions filed by prisoners. *Davis*, 99 F.4th at 654; *see McCoy*, 981 F.3d at 281. The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2021) (emphasis added). Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 281, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain

the discretion of district courts." *Id.* (citation omitted). As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted).

Effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)). The Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Therefore, the Policy Statement is applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction"). As a result, when a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A). The court should apply the Policy Statement that is applicable "at the time the court renders its decision[,]" not at the time the motion is filed. *Crawley*, 140 F.4th at 170.

The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

(B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

Section 1B1.13(b) of the Policy Statement is titled "EXTRAORDINARY AND COMPELLING REASONS." It identifies multiple circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *See* § 1B1.13(b)(1)–(6). These include certain medical circumstances of the defendant, such as a terminal illness, "serious cognitive impairment," a medical condition that requires "specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or the defendant is at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency. . . .", § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, along with other factors, § 1B1.13(b)(2); the defendant's family circumstances, § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, § 1B1.13(b)(4)(A), (B); and for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a non-retroactive change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed. . . .", § 1B1.13(b)(6).

In deciding whether a defendant has met the ten-year requirement, district courts can only consider the time a defendant has served in prison and cannot adjust that amount with good-time credits. *Crawley*, 140 F.4th at 172–73. But, under § 1B1.13(b)(5), the district court may consider "any other circumstance or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." The capacious language in

§ 1B1.13(b)(5) underscores that the enumerated circumstances listed in the Policy Statement are not an "exhaustive list" of extraordinary or compelling reasons.  *Johnson*, 143 F.4th at 216.  For example, in *Johnson*, the Court affirmed a district court's decision to reduce a defendant's sentence based on the disparity between the defendant's sentence and those of his co-conspirators.  *Id.* at 215–16.

Section 1B1.13(c) of the Policy Statement is titled "LIMITATION ON CHANGES IN LAW." It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."  U.S.S.G. § 1B1.13(c).  "However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction."  *Id.*; *see Davis*, 99 F.4th at 654.[8]

Section 1B1.13(d) of the Policy Statement concerns rehabilitation of the defendant.  It limits the weight a court may assign to a defendant's rehabilitation while serving a sentence.  That section provides that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  U.S.S.G.

---

[8] In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act." *Id.* at 500.  However, the Court acknowledged that "Congress or the Constitution [may] limit[ ] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence. . . ." *Id.* at 486.  "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements." *Id.* at 495.

§ 1B1.13(d). "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.* And, § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.

Even if a defendant prisoner establishes that extraordinary and compelling reasons warrant relief, a reduced sentence does not necessarily follow. The court must then consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon*, 560 U.S. at 826–27; *Brown*, 78 F.4th at 128; *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion). Notably, the amendments to the

Guidelines in November 2023 did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with...training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). Additionally, the court may consider the "'kinds of sentences available,' and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Burleigh*, 145 F.4th 541, 548 (quoting 18 U.S.C. § 3553(a)(1), (3), (6)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 F.3d at 500). The district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor." *Davis*, 99 F.4th at 656; *see United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

In *Davis*, 99 F.4th at 659, the Fourth Circuit said: "District courts are not required to acknowledge and address each of the defendant's arguments on the record when conducting a § 3553(a) analysis." But, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

In particular, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022

WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190).  And, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).  Moreover, the district court's "discretion is not boundless" and "in exceptional case[s]" the district court can abuse this discretion either by neglecting to "adequately explain how it weighed the § 3553(a) factors" or by "failing to recognize that the relevant § 3553(a) factors clearly favor release." *United States v. Smith*, 2025 WL 1864767, at *3, *4 (4th Cir. July 7, 2025) (unreported) (cleaned up) (finding that the district court abused its discretion by failing to acknowledge how the "multiplicity of factors combine to make the case for compassionate release").

"How much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

In any event, as stated, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).  It is "not difficult" for a district court to satisfy this standard.  *Burleigh*, 145 F.4th 541, 550.  However, a more detailed explanation may be required if a substantial change in the law creates a disparity between the sentence a defendant

actually received and the sentence he would receive, if sentenced under current law.  *See Davis*, 99 F.4th at 661; *see* 18 U.S.C. § 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."); *see Moody*, 115 F.4th at 310 (recognizing that a defendant may not "challenge the validity of a sentence in a compassionate release" motion but explaining that a court may consider whether a defendant's sentence would be shorter "because of changes in law.").  In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . ." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

Davis*, 99 F.4th 647, is informative.  The Court recognized that a change in the Guidelines or the law can produce a sentencing disparity under § 3553(a)(6).  *Id.* at 654–55.  And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range." *Id.* at 661.

According to the *Davis* Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison." *Id.*  The Court stated, *id.*: "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)(6)).  It concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change in law so substantial." *Davis*, 99 F.4th at 661 (citing *Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)).  As the *Burleigh* Court cautioned, even

if a defendant's sentence "would be shorter if issued today," this fact does not "increase the burden on district courts to explain their decision." *Burleigh,* 145 F.4th, 550, 551.

### III.  Discussion

### A.  Exhaustion

Defendant asserts that he filed a request for compassionate release with the Warden on January 25, 2023.  ECF 358 at 4.  The letter is appended as an exhibit.  ECF 358-1 at 1.  As of the filing of the Motion on October 31, 2023, the Warden had not responded.  *Id.*

The government does not contest administrative exhaustion.  In *Muhammad*, 16 F.4th at 129, the Fourth Circuit made clear that, under a plain reading of the statute, a defendant need only wait until the 30 days have passed from submission of the compassionate release request to the Warden to directly petition the court.  It said, *id.*: "The text of § 3582(c)(1)(A) plainly provides that a defendant may file a motion on his own behalf 30 days after the warden receives his request, regardless of whether the defendant exhausted his administrative remedies."  *Id.*

Accordingly, I am satisfied that defendant has established administrative exhaustion.  *See* 18 U.S.C. § 3582(c)(1)(A); *cf. Muhammad*, 16 F.4th at 129–30 (stating that because the administrative exhaustion requirement is non-jurisdictional, it can be waived if not timely raised by the government).

### B. Extraordinary and Compelling Circumstances

The Motion is founded primarily on the claim that there is a significant disparity between the sentence Byrd received in 2012, pursuant to the Plea Agreement (ECF 57), and the sentence he would receive if sentenced today for the same conduct.  *See* ECF 358 at 5, 8–10.  Byrd also contends that he "has been a model inmate who has demonstrated a remarkable commitment to

24

rehabilitation . . . ."  *Id.*  Moreover, defendant maintains that he "does not pose a risk to society" and he has "become a God fearing man who follows the rules."  *Id.* at 5.

The government observes, ECF 363 at 6: "Byrd relies on one ground for 'extraordinary and compelling' circumstances: the alleged disparity in the sentence he negotiated for and was given (40 years), and the one that might hypothetically be imposed today."  The government adds that defendant "simply extrapolates from aggregated data and speculates that he might possibly have received a shorter sentence today.  *Id.* at 1.

U.S.S.G. § 1B1.13(b)(6), titled "Unusually Long Sentence," provides:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

Section 1B1.13(c) of U.S.S.G., titled "Limitation on Changes in Law," is also noteworthy. It provides: "Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."

In order for U.S.S.G. § 1B1.13(b)(6) to apply here, Byrd must demonstrate that: (1) he "received an unusually long sentence"; (2) "has served at least 10 years" of that sentence; and (3) a change in the law produces "a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed . . . ."

Pursuant to Fed. R. Crim. P 11(c)(1)(C), defendant agreed to a sentence of 40 years of imprisonment for use and discharge of a firearm in relation to crimes of violence. ECF 57, ¶ 8.  He

has served over twelve years of his sentence. Thus, he satisfies the second criterion. I shall assume the sentence is "unusually long." The question, then, is whether Byrd satisfies the third requirement.

The statute governing use and discharge of a firearm in relation to crimes of violence, 18 U.S.C. § 924(c)(1)(A)(iii), carries a minimum sentence of ten years with a maximum of life imprisonment. Defendant argues that, as of the last few years, his 40-year sentence is longer than the average federal sentence for murder. ECF 358 at 9. He points to Sentencing Commission data to suggest that his "sentence is nearly 10 years longer than the current national average sentence for murder." *Id.* (boldface omitted).

The government acknowledges that "the defendant may be correct that there is a general decrease [in sentences] according to the data . . . ." ECF 363 at 6. But, the government asserts that "the figures [defendant] cites are neither extraordinary nor compelling." *Id.* Likewise, the government observes that "vacillations in sentence length which occur over time are not extraordinary." *Id.* And, it posits that it "is not extraordinary and compelling that a 40-year sentence would be meted out as the price one must pay for murder." *Id.* at 7.

Of import, there has been *no change in the law* that relates to the defendant's conviction or sentence. Indeed, Byrd has not identified any change in the law. *See* ECF 358. Rather, citing sentencing data and individual cases, defendant posits that, if he were sentenced today, the general downward trend in sentencing would result in a more lenient sentence. *Id.* at 11. Whether or not this is true, it is not sufficient to satisfy the change in law requirement of U.S.S.G. § 1B1.13(b)(6).

As indicated, the government maintains that "Byrd's entire argument is based on speculation about what kind of sentence he might receive today." ECF 363 at 7. It insists that the defendant has failed to establish a change of law that implicates U.S.S.G. § 1B1.13(b)(6). Rather,

the government claims that Byrd simply believes that his "sentence is too long and maybe he would not make the same deal today." *Id.* at 7.

Even before the amendments of November 1, 2023, in regard to motions for compassionate release, many judges in this District considered a change in the sentencing law landscape that a defendant would face if prosecuted today. *See, e.g.*, *United States v. Chandler*, GLR-05-0181, ECF 119 at 1–2 (D. Md. May 14, 2020); *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), *aff'd*, *McCoy*, 981 F.3d 271; *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020). Judge Bennett of this Court said: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'" *United States v. Johnson*, RDB-07-0153, ECF 183 at 10–11 (D. Md. Oct. 14, 2020).

In *McCoy*, 981 F.3d 271, the Fourth Circuit recognized that "the dramatic degree to which [a defendant's sentence] exceed[s] what Congress now deems appropriate" can provide an extraordinary and compelling reason for a reduction in sentence. *Id.* at 288. The defendants in the cases consolidated for appeal in *McCoy* were convicted of robberies and firearms violations under 18 U.S.C. § 924(c). *Id.* at 274. At the time of their convictions, under the practice known as "stacking," a conviction under 18 U.S.C. § 924(c) "was treated as 'second or subsequent,' triggering [a] 25-year minimum sentence, even if the first § 924(c) conviction was obtained in the same case." *Id.* at 275. After enactment of the First Step Act, however, "the 25-year mandatory

minimum applie[d] only when a prior § 924(c) conviction ar[ose] from a separate case and already . . . bec[a]me final." *Id.* (citation and internal quotation marks omitted). But, the change was not retroactive.

The district courts in *McCoy* granted sentence reductions in part on the basis that, under current law, the defendants would have received sentences significantly less severe than their "stacked" sentences. *Id.* at 274–75. The Fourth Circuit affirmed, holding that "courts legitimately may consider, under the 'extraordinary and compelling reasons' inquiry, that defendants are serving sentences that Congress itself views as dramatically longer than necessary or fair." *Id.* at 285–86.

More recently, in *Brown*, 78 F.4th 122, the Fourth Circuit made clear that a defendant's disparate sentence "is relevant to both the 'extraordinary and compelling reasons' inquiry and the § 3553(a) factors." *Id.* at 130. In *Brown*, the defendant was serving a 57-year sentence, which included a mandatory sentence of 30 years for two convictions under 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime). *Id.* at 124. The Court determined that the district court erred in its compassionate release analysis by failing to consider the defendant's disparate sentence. *Id.* at 124, 130–31. In the Court's view, two features of the sentence provided extraordinary and compelling reasons for relief: the sentence's "sheer and unusual length" in relation to sentences for more serious and violent crimes, and "the gross disparity between" the sentence "and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." *Id.* at 131.

To put Byrd's sentence in context, I shall review the mean and median sentences imposed for certain crimes over the last three years: 2022, 2023, and 2024. Beginning with the year 2022, the mean and median for national sentences imposed for drug trafficking were 78 and 80 months

respectively; for murder, 261 and 240 months; for firearms, 49 and 39 months; and for kidnapping, 184 and 190 months. *Table 15, "Sentence Imposed by Type of Crime,"* at 64, in *2022 Annual Report and Sourcebook of Federal Sentencing Statistics*, U.S. Sent'g Comm'n, https://perma.cc/JJ54-A9PC ("2022 Sourcebook").

Looking at sentences in the Fourth Circuit in 2022, the mean and median sentences imposed for drug trafficking were 89 and 75 months respectively; for murder, 304 months and 300 months; for firearms, 57 and 48 months; for robbery, 120 and 114 months; and for kidnapping 226 and 192 months. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2022, Fourth Circuit*, U.S. Sent'g Comm'n, https://perma.cc/X54Q-JXBQ.

In 2023, the respective mean and median national sentences imposed for drug trafficking were 82 and 63 months; for murder, 285 and 276 months; for firearms, 49 and 40 months; for robbery, 110 and 96 months; and for kidnapping 199 and 168 months. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2023, Fourth Circuit, U.S. Sent'g Comm'n,*, U.S. Sent'g Comm'n, https://perma.cc/AH8J-98K6.

And, in the Fourth Circuit, for fiscal year 2023, the mean and median sentences for drug trafficking were 91 and 75 months; for murder, 295 and 292 months; for firearms, 54 and 48 months; for robbery, 140 and 125 months; and for kidnapping, 169 and 126 months. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2023, Fourth Circuit, U.S. Sent'g Comm'n,*, U.S. Sent'g Comm'n, https://perma.cc/AH8J-98K6.

For 2024, the mean and median national sentences imposed for drug trafficking were 82 and 63 months; for murder, 274 and 240 months; for firearms, 50 and 40 months; for robbery, 110 and 96 months; and for kidnapping 190 and 156 months. *Table 7, "Sentence Length by Type of*

*Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2024, Fourth Circuit, U.S. SENT'G COMM'N,*, U.S. SENT'G COMM'N, https://perma.cc/F267-5LA9.

For that same year, in the Fourth Circuit, the mean and median sentences for drug trafficking were 89 and 72 months; for murder, 273 and 300 months; for firearms, 54 and 46 months; and for robbery, 130 and 120 months. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2024, Fourth Circuit, U.S. SENT'G COMM'N,*, U.S. SENT'G COMM'N, https://perma.cc/F267-5LA9.

Several cases in this District also provide guidance. I shall briefly review them.

In *United States v. Myers*, CCB-01-188, 2021 WL 2401237, at *3 (D. Md. June 11, 2021), the defendant was serving a sentence of 294 months for multiple robberies committed in the late 1990's. *Id.* at *1. He moved for compassionate release. Judge Blake recognized a change in the law since the defendant's sentencing, stating that "the guideline sentence imposed [was] no longer mandatory, and . . . it [was] doubtful whether Myer**s** would still qualify as a career offender. . . ." *Id.* at *3 (internal citations omitted). But, she did not find that the sentence imposed was grossly disproportionate or excessive.

Judge Blake reviewed that, in evaluating a motion for sentence reduction based on changes in the law that create a sentencing disparity, a court should consider: (1) whether the sentence imposed is grossly disproportionate to a sentence the defendant would likely receive if sentenced today, signifying that the sentence is "dramatically longer than necessary or fair;" (2) whether the sentence imposed is unusually or grossly lengthy in comparison to sentences currently imposed for similar or more serious offenses; (3) the length of the sentence the defendant already has served; and (4) other personal characteristics of the defendant, which may include the defendant's relative youth at the time of the offense and their post-sentencing conduct in the BOP. *Id.*

Upon review, Judge Blake concluded that the defendant's sentence was "not dramatically different from the range [he] would face today." *Id.* She denied the defendant's motion. *Id.* at *4.

In *United States v. Blake*, ELH-06-394, the defendant was convicted in 2007 of carjacking resulting in death; conspiracy to possess a firearm in furtherance of a crime of violence; possession of a firearm in furtherance of a crime of violence; and murder resulting from possession of a firearm in furtherance of a crime of violence. *See id.*, ECF 62 (Judgment).[9] In particular, when Blake was seventeen years old, he participated in a carjacking in which the victim was murdered. *See id.*, ECF 123 at 3; *id.*, ECF 149 at 2. Blake denied that he was the shooter, however. *Id.*, ECF 123-1 at 5. Judge Nickerson sentenced the defendant to life imprisonment. *Id.*, ECF 62.

In 2019, pursuant to a joint motion by the government and the defendant in connection with the defendant's petition under 28 U.S.C. § 2255, I reduced the defendant's sentence to forty years of imprisonment. *Id.*, ECF 123, ECF 127. Then, in 2021, the sentence was reduced again, to thirty years of imprisonment, pursuant to a joint motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). *Id.*, ECF 165, ECF 168. Notably, when Blake committed the offense, he was ten years younger than Byrd was when he murdered Callaway.

In *United States v. Byers*, 649 F.3d 197 (4th Cir. 2011), defendants Byers and Goodman were convicted at trial in a case involving the murder-for-hire of a witness in a drug case. *Id.* In 2009, both received life sentences. *Id.* at 206. A third defendant, the triggerman, was fifteen at the time of the murder. *Id.* at 204 n.3. He entered into a plea agreement that provided for a 40-year sentence. *Id.* The Fourth Circuit affirmed. *Byers,* 649 F.3d at 217.

---

[9] This case was originally assigned to Judge William Nickerson. It was reassigned to me on January 29, 2016, due to the retirement of Judge Nickerson. *See* Docket.

At the time of the murder here, Byrd was almost ten years older than the triggerman in *Byers*. ECF 10 at 1. Yet, the triggerman in *Byers* received a sentence comparable to the one Byrd received.

In *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted in 2018 after a 25-day trial. *See id.*, ECF 477; ECF 491. In particular, he was convicted of racketeering conspiracy that included murders and drug conspiracy. However, Floyd was not the shooter. Although the defendant's offense level and criminal history category called for a life sentence, Judge Blake imposed a total sentence of 360 months of imprisonment. *Id.*, ECF 691 (Judgment).

*United States v. Antoine*, PWG-19-140, was a multi-defendant case. Antoine was involved in a drug trafficking organization in Baltimore. He confessed to the intentional shooting and killing of an individual in relation to a drug conspiracy. *See id.*, ECF 349 (Plea Agreement) at 9–10. In 2020, pursuant to a plea agreement entered under Fed. R. Crim. P. 11(c)(1)(C), Antoine pleaded guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and (j). *Id.*, ECF 348. Although the defendant shot the victim in the head (ECF 349 at 9), the government agreed to a term of imprisonment ranging between twenty and twenty-five years. *Id.*, ECF 349, ¶ 12.

Antoine was twenty-five years old at sentencing in 2021. *Id.*, ECF 463 (PSR), at 3. Judge Grimm sentenced him to a total term of 270 months of imprisonment, *i.e.*, twenty-two and a half years. *Id.*, ECF 465 (Judgment).

In *United States v. Warren, et al.*, JKB-22-439, a multi-defendant case, Warren was a member of a gang that engaged in "a pattern of racketeering activity that included conspiracy to

distribute controlled substances, possession with intent to distribute controlled substances, robbery and murder." *See id.*, ECF 271-1 at 1. Pursuant to a plea agreement (*id.*, ECF 271), Warren pleaded guilty to one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). *Id.*, ¶ 1. The pattern of racketeering activity included a conspiracy that involved the attempt to murder five individuals. *Id.*, ECF 271-1 at 2. The parties agreed to a sentence of 396 months of imprisonment as the appropriate disposition of the case. *See id.* ¶ 10. But, the plea was not entered under Fed. R. Crim. P. 11(c)(1)(C).

At sentencing in 2024, the defendant was thirty-two years old. *Id.*, ECF 290 (PSR), at 3. Judge Bredar sentenced the defendant to a term of 467 months of imprisonment, *i.e.*, thirty-eight years and eleven months. *Id.*, ECF 292 (Judgment).

Four defendants were charged in *United States v. Whisonant, et al.*, ELH-17-191. Each pleaded guilty in 2021 to the offense of conspiracy to distribute heroin. *Id.*, ECF 71, ¶ 1; ECF 119, ¶ 1; ECF 123, ¶ 1; ECF 149, ¶ 1 (plea agreements). Relevant here, three of the defendants also pleaded guilty to offenses involving firearms. *Id.*, ECF 119, ¶ 1; ECF 123, ¶ 1; ECF 149 ¶ 1. In particular, Whisonant pleaded guilty to possession of a firearm in furtherance of a drug trafficking crime, *id.*, ECF 149, ¶ 1, while two other defendants pled guilty to discharging a firearm resulting in death, during and in relation to a drug trafficking crime. *Id.*, ECF 119 ¶ 1; ECF 123, ¶ 1. The murder was unexpectedly captured, in real time, during an authorized wiretap. *Id.*, ECF 152 at 2.

In 2018, Whisonant received a total sentence of 360 months of imprisonment (*id.*, ECF 180), and the shooters received sentences of imprisonment of 420 months (*id.*, ECF 163) and 480 months. *See id.*, ECF 184. By Order of June 26, 2023, pursuant to § 3582(c)(1)(A)(i), Whisonant's sentence was reduced to 295 months. *See id.,* ECF 335; *see also* ECF 334 at 38 (noting that Whisonant was not the shooter).

33

*United States v. Johnson*, LKG-16-267, is also instructive.  In 2018, the court imposed a 30-year sentence for the shooter in regard to multiple murders, pursuant to a plea agreement (*id.*, ECF 897), entered under Fed. R. Crim. P. 11(c)(1)(C). *Id.*, ¶ 1; ECF 953 (Judgment). The defendant later sought compassionate release. *Id.,* ECF 1819.  The court concluded the sentence fell within the range of comparable sentences in the Fourth Circuit, given "that approximately 44% of those sentenced under those parameters received a sentence of 30 years or more, with 32.8% receiving a sentence of life in prison." *Id.,* 2025 WL 2085018, at *7, *8 (D. Md. July 24, 2025).

Other cases are also noteworthy.  *See*, *e.g.*, *United States v. Thomas*, CCB-04-232, 2024 WL 5239411, at *1 (D. Md. Dec. 27, 2024) (reducing a life sentence to 35 years for a murder for hire where the defendant was the triggerman); *United States v. Kirkland*, ELH-94-010, 2024 WL 4529303, at *1, *8 (D. Md. Oct. 18, 2024) (reducing a life sentence to 40 years where the defendant, 25 years of age at sentencing, aided and abetted the murder of a federal witness by identifying the victim); *United States v. Addison*, CCB-98-0210, 2024 WL 5202243, at *1(D. Md. Dec. 23, 2024) (reducing multiple life sentences to 35 years for a defendant who had ordered murders in furtherance of a drug conspiracy); *United States v. Savoy*, JKB-05-00415, 2024 WL 3091125, at *1 (D. Md. June 21, 2024) (reducing a life sentence to 30 years for the defendant's non-fatal shooting of a police officer during a night club brawl).

Byrd suggests he should receive the mean sentence in the District of Maryland for murder. ECF 358 at 10.  In 2024, the mean sentence was 273 months.  *See Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2021, District of Maryland*, U.S. Sent'g Comm'n, https://perma.cc/CRF6-DP7G.  However, a mean sentence does not mean that all murder sentences are that length.  Instead, it charts the middle of a distribution of disparate sentences.  By its terms, it means that half the sentences for murder in the Fourth Circuit are higher

and half are lower.  In fact, sentences of 470 months or greater (including life) were inputted in the sentence average computations as 470 months, creating a ceiling for the sentence average. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2024, District of Maryland*, U.S. SENT'G COMM'N, https://perma.cc/UBA6-337E.

Defendant's sentence of 40 years exceeds current national averages.  But, the cases set forth above suggest that, even in the current sentencing climate, the length of Byrd's sentence is not outside the norm of sentences meted out for murder.

The defendant's 480-month sentence does not reflect the "sheer and unusual length" of the sentence the Fourth Circuit described in *Brown*, 78 F.4th 122 at 131.  Moreover, Byrd's actions in killing a 19-year old were undeniably calculated, cold-blooded, and brutal.  Byrd and his co-defendants plotted Callaway's murder over the course of three meetings.  ECF 57-1 at 7.  They lured Callaway to the murder site.  *Id.*  Then, Byrd brutally shot Callaway in the head four times, at close range.  *Id.* at 2.

The gravity of the crime is heightened because it was committed to ensure that Callaway "did not cooperate with law enforcement and disclose the criminal activities of Byrd's co-defendants."  ECF 363 at 9.  Murdering a witness merits severe punishment.  An attack on a witness is an attack on the justice system.

The Fourth Circuit has observed that "fundamental to our conception of a fair and just system of criminal adjudication . . . is the vigorous and candid participation of relevant witnesses." *United States v. Jackson,* 706 F.3d 264, 269 (4th Cir. 2013). The murder of a witness "throw[s] the system off kilter by hindering factual development in criminal prosecutions and the adversarial process from playing out as the Framers intended."  *Id.*  Indeed, the killing of a witness obstructs the case and creates a culture of fear that stifles others from cooperating.

It is also noteworthy that, as the government points out, Byrd's co-defendant, Marfo, who went to trial, received four concurrent life sentences. ECF 363 at 10; *see* ECF 117 at 3. Byrd received a lower sentence because he bargained for it in his Plea Agreement. *See* ECF 57 at 9; ECF 57-1. Byrd's Plea Agreement (ECF 57), entered under Fed. R. Crim. P. 11(c)(1)(C), provided for a 40-year sentence. As the government asserts, the disparity between defendant's sentence and that of his co-defendant shows the benefit of his plea. ECF 363 at 2.

I am unpersuaded that there is a significant disparity between Mr. Byrd's 40 year sentence and the sentence he would receive for the offense if sentenced today. A defendant convicted of murder for hire of a potential trial witness, and who actually is the one who committed the murder, could readily receive a comparable sentence today in the District of Maryland.

In sum, Mr. Byrd has not shown that a sentencing disparity provides an "extraordinary and compelling reason" to reduce his sentence under § 3582(c)(1)(A).

### C. 18 U.S.C. § 3355(a)

Even assuming that defendant has established an extraordinary and compelling reason for compassionate release, that finding would not end the inquiry. The Court must next consider the sentencing factors in 18 U.S.C. § 3355(a). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

To be sure, defendant's criminal history is not extensive. Byrd has only two prior criminal convictions. ECF 348 ¶¶ 38–40. In particular, in 2004 Byrd was convicted of theft less than $500 and he was placed on one year of unsupervised probation. *Id.* ¶ 38. And, in 2005, he was convicted

of the offense of unregistered rifle/shotgun, for which he was sentenced to five months and 23 days of incarceration. *Id*. ¶ 39.

Where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019); *Kibble*, 992 F.3d at 334 n.3. Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture" of a defendant's "'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The court must "at least weigh the [defendant's] conduct in the years since the[ ] initial sentencing[ ]." *McDonald*, 986 F.3d at 412; *see Martin*, 916 F.3d at 397 (requiring an "individualized explanation" as to rehabilitative efforts).

Rehabilitation efforts should be considered in regard to a motion for compassionate release. *See United States v. Lancaster*, 997 F.3d 171, 175 (2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410–12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct). However, "rehabilitation alone cannot constitute an extraordinary and compelling reason for

release." *United States v. Davis*, No. 21-6960, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (citing *McCoy*, 981 F.3d at 286 n.9); *see* § 994(t).

Byrd argues that he is fully rehabilitated and that he "is not a danger to the community." ECF 358 at 15.  He contends that he has "developed spiritually and he finds guidance, discipline, and comfort in his faith.  Defendant has also completed twenty-two educational courses, including drug education, and obtained his GED while in BOP custody.  ECF 358-1 at 4.  Moreover, defendant became a "suicide watch observer," in order to contribute to the community in his prison. ECF 358-1 at 4.  Further, defendant claims that he has "taken on mentorship roles, tutoring fellow inmates and encouraging them to make positive choices and further their education." *Id.* These achievements are praiseworthy.  Defendant's post-sentencing conduct weighs in his favor.

The government describes defendant's attempts at rehabilitation as laudable, but notes Byrd's BOP disciplinary record reflects a modest number of infractions, some more serious than others, with four between 2013 and 2017. *See* ECF 340-3; *see also* ECF 358-1 at 4.  In December 2017, Byrd was cited for being in an unauthorized area, and lost his email, visiting, and commissary privileges for 90 days.  ECF 340-3 at 1.  In October 2017, he was cited for being "insolent" to a staff member and lost his visiting and commissary privileges for 60 days.  *Id.*  In February 2016, defendant was cited for possessing alcohol, for which he was fined $50, lost 41 days of good time credit, received 30 days of disciplinary segregation, and lost his commissary privileges for 180 days.  *Id.*  Finally, in March 2013, he was cited for possessing a dangerous weapon, and lost 27 days of good time credit, received 30 days of disciplinary segregation, and lost his commissary and telephone privileges for 120 days.  *Id.* at 1–2.  Notably, and to defendant's credit, he has not incurred citations since December 2017.  ECF 358-1.

Still, defendant's crime was extremely serious. Byrd does not dispute the weightiness of the offense, and states that he has expressed his sincere remorse for his actions and continues to do so. ECF 358 at 13. However, it is difficult to overlook the cold-blooded nature of the killing of a teenager. ECF 57-1 at 2. Defendant murdered Callaway for $2,000. *Id*. at 7. Callaway was not a random stranger to Byrd, but someone Byrd knew and with whom the defendant had spent time. *Id*. at 6. Indeed, Byrd and his co-defendants referred to Callaway as "the kid." *Id*. at 3, 4, 7, 8, 9. This nickname was fitting because, as mentioned earlier, Callaway was just 19 years of age when Byrd fired four bullets into his head. *Id*. at 2.

The sentence of 480 months reflects the seriousness of the offense and the need to prevent witness intimidation. *See United States v. Johnson*, No. 3:01-CR-00304-10, 2025 WL 608624, at *15 (E.D. Va. Feb. 25, 2025); *United States v. Greene*, No. 3:09-CR-00039-FDW, 2023 WL 2593017, at *6 (W.D.N.C. Mar. 21, 2023), appeal dismissed, No. 23-6452, 2023 WL 7319046 (4th Cir. Sept. 21, 2023); *United States v. Davis*, 581 F. Supp. 3d 759, 773 (E.D. Va. 2022).

Furthermore, Byrd's sentence was one to which he agreed. ECF 57. As the government highlights, Byrd received the benefit of the bargain in the dismissal of the counts that earned Marfo four concurrent life sentences. ECF 363 at 10. He has only served a little more than one third of his sentence. A sentence reduction would not promote respect for the law. As I see it, the period of incarceration that Byrd has served to date is not sufficient to warrant a significant reduction in his sentence.

## III.    Conclusion

Given the seriousness of Byrd's offense, a reduction in the sentence would not, in my view, promote respect for the law, provide just punishment, or deter criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(A)–(C). Therefore, I shall deny defendant's Motion.

An Order follows, consistent with this Memorandum Opinion.


Date: October 31, 2025                                    _____/s/_____
                                                         Ellen Lipton Hollander
                                                         United States District Judge